1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10
11    JOSE ANTHONY TORRES,                    CASE NO. CV F 05-01479 LJO TAG HC

12                         Petitioner,        **ORDER DENYING AMENDED PETITION**
                                              **FOR WRIT OF HABEAS CORPUS WITH**
13         vs.                                **PREJUDICE; DIRECTING CLERK OF**
                                              **COURT TO ENTER JUDGMENT FOR**
14    J. SCRIBNER,                            **RESPONDENT; DECLINING ISSUANCE**
                                              **OF CERTIFICATE OF APPEALABILITY**
15                         Respondent.
16    _____/

17         On November 22, 2005, Jose Anthony Torres ("Petitioner"), a *pro se* California prisoner, filed

18    a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254

19    ("Petition").[1]  On February 28, 2007, Petitioner filed an Amended Petition.  On May 14, 2008, J.

20    Scribner ("Respondent") filed an Answer to the Amended Petition.  On June 10, 2008, Petitioner filed

21    a Traverse to the Answer.  Thus, this matter is ready for decision.

22                              **PROCEDURAL HISTORY**

23         On July 2, 2002, a Fresno County Superior Court jury convicted Petitioner of first degree murder

24    (Cal. Penal Code § 187(a)) and found true the personal use of a firearm that causes great bodily injury

25    or death (*id.* § 12022.53(d)).  (Clerk's Tr. ("CT") 244, 246-47, 249.)  On August 2, 2002, the superior

26
27    _____

28         [1]      Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
      the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

                                              1

1   court sentenced Petitioner to twenty-five years to life for the murder count and a consecutive

2   enhancement of twenty-five years to life for the personal use of a firearm. (*Id.* 248-50.)

3        On August 7, 2002, Petitioner appealed his conviction to the California Court of Appeal. (CT

4   251.) On August 18, 2004, the court of appeal affirmed Petitioner's conviction in a reasoned opinion.

5   (Lodged Doc. ("LD") 8.) On September 27, 2004, Petitioner filed a petition for review in the California

6   Supreme Court. (LD 9.) On November 10, 2004, the supreme court summarily denied the petition for

7   review. (*Id.*)

8        On October 11, 2005, Petitioner filed a habeas petition in the Fresno County Superior Court.

9   (LD 10.) On October 26, 2005, the superior court denied the habeas petition on the merits and on

10  procedural grounds. (*Id.*) On November 22, 2005, Petitioner filed his federal Petition. On November

11  23, 2005, Petitioner filed a habeas petition in the California Court of Appeal. (LD 11.) On January 12,

12  2006, the court of appeal denied the habeas petition without prejudice for failure (1) to set forth

13  sufficient facts, (2) to provide citations to the appellate record, and (3) to show that Petitioner exhausted

14  his remedy in the superior court. (*Id.*) On January 31, 2006, Petitioner filed a habeas petition in the

15  California Supreme Court. (LD 12.) On September 27, 2006, the supreme court denied the habeas

16  petition without comment but with citation to *In re Swain*, 34 Cal. 2d 300, 304 (1949) and *People v.*

17  *Duvall*, 9 Cal. 4th 464, 474 (1995).

18  **FACTUAL BACKGROUND**[2]

19       On the evening of April 25, 2000, Ny Noy was fatally shot in the back outside his
    apartment building on South Dearing Street in Fresno. [Petitioner] was immediately
20  suspected of the killing. [Petitioner] believed his girlfriend was having an affair with Mr.
    Noy, and he spent the preceding days searching for Mr. Noy and threatening to kill him.
21  In February 2002, [Petitioner] was apprehended after being in Mexico for nearly two
    years. [Petitioner] claimed he didn't shoot Mr. Noy and he left for Mexico just a few
22  hours before the homicide. [Petitioner] was convicted of first degree murder with a
    firearm enhancement and sentenced to 50 years to life.
23  **The Neighborhood**
        [Petitioner] and Sorn "Lisa" Yim had two children and were together for about
24  five years. In March 2000, Lisa wrote to [Petitioner] that she didn't want to be with him
    anymore. [Petitioner] believed Lisa was having an affair with their neighbor, Ny Noy.
25  In March 2000, [Petitioner] sent Lisa two letters and threatened to kill Mr. Noy because

26

27       [2]    Because Petitioner challenges the sufficiency of the evidence, the Court has reviewed, independently, the
    state court record. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997). Based on this review, the Court adopts the
28  factual background from the August 18, 2004, California Court of Appeal opinion on direct review as a fair and accurate
    summary of the evidence presented at trial. *See id.*; *see also* 28 U.S.C. § 2254(d)(2), (e)(1).

of the alleged affair. At trial, Lisa testified she never had a sexual relationship with Mr. Noy.

At some point in April 2000, [Petitioner] returned to Fresno County after being gone for several months. [Petitioner] told his brother that he believed Lisa was having an affair. [Petitioner] told his sister that Lisa was having an affair with Mr. Noy, and [Petitioner] was sad about it.

Ny Noy and his wife, Sary Phan, lived at an apartment complex on South Dearing Street, just down the street from where [Petitioner] and Lisa had lived together. The neighborhood was predominantly Cambodian. Ms. Phan knew [Petitioner] and Lisa, and she used to see [Petitioner] around the South Dearing apartment complex "off and on." As of April 2000, she hadn't seen [Petitioner] for several months. Ms. Phan knew Lisa very well and was close to her.

Sitha Yith was a close friend of Mr. Noy. A few days before April 25, 2000, Mr. Noy told Mr. Yith that [Petitioner] was looking for him and going to hurt him. Mr. Noy appeared to be depressed and worried. Mr. Yith advised Mr. Noy not to get into a fight with [Petitioner].

**April 22, 2000**

Kathy Sao was married to Lisa Yim's brother. The Saos lived in an apartment on Hamilton, which was very close to Mr. Noy's apartment building on South Dearing. On or about April 22, 2000, [Petitioner] went to Kathy Sao's apartment and said that Lisa was having an affair with another guy. [Petitioner] initially used a normal tone of voice, but he became more "hyped up" and said Lisa was a bitch and a whore. [Petitioner] wanted to know where Lisa was, and Ms. Sao replied that she didn't know. [Petitioner] told Ms. Sao that "whoever is hiding Lisa or whatever, he's going to whatever kill him or whatever. Then he's going to find out who that guy is and kill him and Lisa." Ms. Sao testified [Petitioner] yelled and acted "kind of scary," but he was also smirking.

On or about the same day, [Petitioner] found Lisa at her mother's house and asked Lisa to reconcile with him. Lisa refused and said she didn't want to be with him anymore. [Petitioner] accused her of having an affair with Mr. Noy and Lisa denied it. [Petitioner] threatened to kill Lisa and the children, and then shoot himself.

**April 23, 2000**

On or about April 23, 2000, [Petitioner] again appeared at the Saos' apartment. [Petitioner] asked Mr. Sao if he had a gun. Mr. Sao didn't respond and went into the apartment. Kathy Sao told [Petitioner] they didn't have a gun, and "'if we had a gun, why would we want to give it to you if you're going to go kill his sister?'" [Petitioner] didn't reply and left.

**April 24, 2000**

On April 24, 2000, [Petitioner] called Sary Phan, Mr. Noy's wife. [Petitioner] said that Mr. Noy was having an affair with Lisa, and threatened to kill him. Mr. Noy was not home when Ms. Phan received the call. Ms. Phan gave [Petitioner] the cell phone number for Somonn In, who was Mr. Noy's employer. Ms. Phan later talked to Mr. Noy about [Petitioner's] accusation. Mr. Noy said it wasn't true and he didn't know what [Petitioner] was talking about. Ms. Phan trusted Mr. Noy and didn't believe the accusation.

Also that day, [Petitioner] arrived at the home of Lisa Yim's mother and asked if Lisa and the children were there. [Petitioner] had a straight face and didn't smile. Mrs. Yim replied they weren't there. [Petitioner] asked to come in, and she allowed him to enter the house. [Petitioner] searched the residence for Lisa and the children. [Petitioner] asked where they were, and Mrs. Yim replied that she didn't know. Mrs. Yim testified that as [Petitioner] left, he said: "'If I could not find my wife and my children, I will kill them all,'" or that he would kill "Lisa and my family." [Petitioner] used a normal voice and did not scream at her, but he was very serious. [Petitioner] didn't say why he was

looking for them.[3]

At some point that day, Sitha Yith saw [Petitioner] on South Dearing Street. [Petitioner] said he was looking for Mr. Noy, and he had to talk to Mr. Noy to solve their problem.

**April 25, 2000**

As of April 25, 2000, [Petitioner] had called Somonn In's cell phone more than 10 times and asked to speak to Mr. Noy. Mr. Noy told Somonn In that [Petitioner] wanted to hurt him. Mr. Noy went to work that morning with Somonn In. Mr. Noy asked Mr. In if he would go home with him that evening because he was scared. Mr. Noy thought the person would not carry out the threats if Mr. In was with him. Mr. Noy did not say anything about wanting to hurt [Petitioner].

Mao Samreth lived in the apartment building behind Mr. Noy's residence, and he knew Mr. Noy very well. Mr. Samreth briefly spoke with Mr. Noy on April 25th, but Mr. Noy did not say anything about being afraid or threatened.

On the morning of April 25, 2000, Lisa Yim went to the police department to obtain an emergency protective order against [Petitioner]. Lisa testified she decided to get the order because of threats he made against her a few days earlier. Lisa was scared because she knew [Petitioner] had been looking for her that week. Officer John Conlee spoke to Lisa about the protective order, and she said [Petitioner] talked to her mother the previous day and threatened to kill her. Lisa also said [Petitioner] spoke to her the previous Saturday at her mother's house and created a disturbance. Lisa called the police but [Petitioner] left before they arrived.

On the afternoon of April 25th, Sary Phan, Mr. Noy's wife, saw [Petitioner] in the parking lot of her apartment complex on South Dearing. [Petitioner] said he was looking for Mr. Noy and needed to talk with him. [Petitioner] said Mr. Noy had an affair with Lisa and he wanted to kill him.[4] After [Petitioner] left, Ms. Phan called Mr. Noy and warned him about [Petitioner's] threats. Ms. Phan told Mr. Noy to be careful, but he had to take care of this problem with [Petitioner]. Mr. Noy replied he had nothing to worry about because he didn't have any problems with [Petitioner].

Rann Phan, Mr. Noy's sister-in-law, lived downstairs in the same apartment building as Mr. Noy and his wife. Around 1:00 p.m. on April 25, 2000, [Petitioner] arrived at Rann Phan's apartment and asked if Mr. Noy was there. [Petitioner] accused Ms. Phan of hiding Mr. Noy, but she repeatedly said that Mr. Noy wasn't there. Ms. Phan testified [Petitioner] was very angry, his voice was loud, his eyes were "just shifting all over the place" as he looked through the doorway, and she was afraid of him.

Rann Phan testified [Petitioner] returned to her apartment five times that day, and repeatedly insisted she was hiding Mr. Noy. [Petitioner's] last visit to her apartment was around 6:00 p.m. Ms. Phan testified that [Petitioner] looked "like he was going to kill someone." Ms. Phan also saw [Petitioner] in the parking lot and breezeway of the South Dearing apartment building.

Around 5:00 p.m. on April 25, 2000, Kathy Sao saw [Petitioner] in a maroon-colored minivan which pulled into the parking lot of her apartment building on Hamilton. [Petitioner] was in the passenger seat, but someone else was driving and there

---

3         [California Court of Appeal footnote 2:] Lisa had moved in with [Petitioner's] brother, who was sympathetic to her decision to stay away from [Petitioner].

4         [California Court of Appeal footnote 3:] Sary Phan, Mr. Noy's wife, initially testified that [Petitioner] threatened Mr. Noy when she saw [Petitioner] in the parking lot on April 25th. Ms. Phan later testified [Petitioner] only threatened Mr. Noy during the telephone call on April 24, 2000. Ms. Phan was impeached with her statement to the police that [Petitioner] never threatened to harm Mr. Noy. Ms. Phan clarified that she was only meant [Petitioner] didn't make any threats when she saw him in the parking lot.

were other people in the car.[5]

**The Homicide**

Around 7:00 p.m. on April 25, 2000, It Chey drove his Chevrolet Blazer to Mr. Noy's apartment on South Dearing to socialize and drink beer. Mr. Noy was not home yet, so Mr. Chey sat on the balcony, drank beer and waited for him.

Mr. Noy and Somonn In arrived at the apartment complex after work, and they met It Chey. Mr. Noy briefly went into his apartment to speak with his wife, then went down to the garage and drank beer with Mr. Chey and Mr. In. At some point during the evening, Mr. Noy told Mr. Chey that someone was trying to hurt him. Mr. Noy asked Mr. Chey to keep his eyes open. Mr. Noy also received several calls on his cell phone.

At some point between 7:00 p.m. and 8:00 p.m., Mr. Chey and Mr. In left Mr. Noy's apartment building in the Blazer. Mr. Chey drove to Mr. In's house because Mr. In needed to clean up after work.

Around 8:00 p.m. on April 25, 2000, Sitha Yith joined Mr. Noy in front of the garage at the South Dearing apartment building. Mr. Yith testified Mr. Noy received a telephone call, and Mr. Noy told the caller to come by in about 20 or 30 minutes. Mr. Noy told Mr. Yith that he had been talking to [Petitioner], that [Petitioner] wanted to speak with him, and [Petitioner] was going to arrive at the apartment building within a half hour. Mr. Noy advised Mr. Yith "to kind of watch out" because Mr. Noy was afraid of [Petitioner] and didn't know if [Petitioner] was going to come "with any type of weapons or not." Mr. Noy was afraid [Petitioner] might shoot him. Mr. Yith told Mr. Noy to be careful, to stay by the parked cars in the garage, and not to go outside because a bullet "does not have eyes, so it cannot see you so if you try to hide." Mr. Noy never said that he wanted to confront or hurt [Petitioner]. Mr. Yith did not see Mr. Noy with a gun. Mr. Yith stayed with Mr. Noy at the garage and waited for a half hour.

While they were waiting, Mr. Chey and Mr. In returned in the Blazer, and Mr. Chey parked on the street near the building's driveway. Mr. Yith continued to wait for [Petitioner] but he never arrived, and Mr. Yith decided to leave. Around 9:00 p.m., Mr. Yith walked across the street to his own apartment. Mr. Yith testified he was crossing South Dearing Street when he saw [Petitioner] sitting on the staircase of the apartment complex across from Mr. Noy's residence. Mr. Yith passed [Petitioner] but didn't speak to him. Mr. Yith noticed a red Honda and a blue Honda were parked on the street.[6]

Mr. Chey and Mr. In remained in the Blazer, which was parked on the street. Mr. In opened the passenger door and they talked with Mr. Noy for about five minutes. Mr. Noy then decided to return to his apartment. Mr. In warned Mr. Noy to be careful, stay in his house, and lock the door. Mr. Noy turned toward the apartment building and headed into the parking lot.

As Mr. Noy walked toward the building's staircase, Mr. In heard something smash into the Blazer's back window and break the glass. Immediately thereafter, Mr. Chey and Mr. In heard gunshots being fired from the street behind the Blazer. Mr. Chey testified more than five shots were fired very fast. The shots seemed to be fired from the rear driver's side of the Blazer, and about 15 to 18 feet away.

Mr. In heard someone yell and shout just before the shots were fired, and Mr. Noy turned around. This person continued to yell as the shots were fired. Mr. In recognized this person's voice as the same man who repeatedly called his cell phone and talked to Mr. Noy that week.

---

[5]     [California Court of Appeal footnote 4:] On cross-examination, Kathy Sao admitted she failed to tell the police about all her contacts with [Petitioner] before the shooting.

[6]     [California Court of Appeal footnote 5:] Mr. Yith's sequence of events conflicts slightly with Mr. Chey's testimony. Mr. Chey testified he returned to Mr. Noy's apartment building with Mr. In, and he parked his Blazer on South Dearing Street near the building's driveway. Both Mr. Chey and Mr. In testified Mr. Noy was not outside and had returned to his apartment. Mr. In called Mr. Noy and said they were back, and Mr. Noy returned outside.

Mr. In thought three to five shots were initially fired. Mr. In turned around and saw the muzzle flash. He also saw a person's shadow behind the passenger side of the Blazer. Mr. In believed the person was holding "a long gun" or a rifle. Mr. In also believed the gunman was wearing a brown cap.

Mr. In told Mr. Chey to take off because someone was shooting at them. Mr. Chey started the Blazer and tore down the street. Mr. Chey did not see Mr. Noy's reactions to the shots because he was too busy driving away. They went about 250 feet when someone fired two or three shots at the Blazer, from a position about seven to 10 feet behind the vehicle.

Mr. Chey drove down South Dearing Street, but he quickly turned around and returned to the apartment building to look for Mr. Noy. Mr. In testified someone shot at them again as they turned around, and he saw one person standing in the middle of the street. Mr. In could clearly see the muzzle flash from the gun barrel, and this weapon appeared to be a handgun. Mr. In testified the gunman pointed the weapon at them, fired the shots, and then ran away.

Mr. Noy's apartment building on South Dearing is back-to-back with an apartment building on South Recreation Street. There is a dirt alley behind the South Dearing building. A wooden fence separates the back of the two buildings. There is a gap between the fence slats which allows a dirt path to pass between the two buildings. The neighbors regularly use the fence gap as a short-cut between the buildings.

Mr. Chey pulled into the building's parking lot. Mr. Chey and Mr. In jumped out of the car and ran around the apartment complex to look for Mr. Noy. Neither Mr. Chey nor Mr. In went through the fence gap or looked behind the building.

Sitha Yith, who lived across the street, also heard the gunshots that night. Mr. Yith testified that about 15 minutes after he left Mr. Noy and walked past [Petitioner], he heard "quite a few" shots fired in a continuous succession, but he didn't see anyone with a gun. Mr. Yith ran back to Mr. Noy's apartment building and didn't see [Petitioner]. Mr. Noy's wife also heard the shots and said that Mr. Noy was missing. Mr. Yith joined other neighbors who were running around the complex and looking for Mr. Noy, but Mr. Yith didn't go through the fence gap behind the building.

Mr. Yith testified the red and blue Hondas, which had been parked on South Dearing Street, "sped out very fast" after the shooting, but he couldn't see the occupants.

Around 10:00 p.m. on April 25, 2000, Mao Samreth was in his residence in the apartment building on South Recreation Street, behind Mr. Noy's building, when he heard gunshots fired. Mr. Samreth went downstairs to investigate and walked through the fence gap to the apartment building on South Dearing Street. He didn't see anyone on the path through the fence gap.

Around 10:30 p.m. several officers from the Fresno Police Department responded to South Dearing Street to investigate the shooting. The officers initially detained Mr. Chey and Mr. In as suspects because they were very excited, running around, and still looking for Mr. Noy.

Mao Samreth stayed at the scene and watched the police interview witnesses. Mr. Samreth watched for "a while" and then decided to return to his apartment through the fence gap. As he walked along the path, he saw three beer bottles on the ground and decided to collect them for resale. He leaned down to pick up the bottles and suddenly saw a body on the ground. Mr. Samreth dropped the bottles and shouted to the police that he had found Mr. Noy. Mr. Samreth testified "quite some time" had passed between his initial walk through the fence gap to reach South Dearing Street, and when he headed back to his own apartment and found Mr. Noy.

**The Crime Scene**

Mr. Noy's body was found on the west side of the fence gap behind his apartment building. He was lying face-down on the ground. He had suffered a single fatal gunshot wound in the back from a .22-caliber hollow-point bullet. The bullet's path was from right to left, and slightly upward. The bullet inflicted fatal damage to Mr. Noy's heart, lung, and liver, and lodged in his upper left rib cage. Mr. Noy also suffered nonfatal

6

abrasions on the right side of his face, which occurred when he fell to the ground.

The officers found a trail of blood on the ground, and blood drops behind the South Recreation Street apartment building. There were no blood drops on the west side of the fence gap, except for the blood around the victim's body. There were shoe prints on the east side of the fence gap, and partial shoe prints on the west side. The shoe prints appeared to match the victim's shoes.

The officers found seven expended .22-caliber cartridge casings in front of Mr. Noy's apartment building on South Dearing Street. The markings on the fatal bullet were consistent with those on the expended .22-caliber casings. A criminalist later determined the fatal bullet and casings were fired from a Mossberg rifle.

The only weapon recovered from the scene was a .38-caliber revolver, which was found on the east side of the fence gap, about 16 feet from Mr. Noy's body. The revolver was partially inside a plastic bag. There was blood and dirt on both the gun and the bag. The revolver was fully loaded with six live .38-caliber bullets but it had not been fired. There were four live .38-caliber bullets in the victim's front right jacket pocket, and another live round was found inside the lining of his jacket. There were no shell casings at the scene which matched the .38-caliber revolver. There were no fingerprints on the .38-caliber revolver, the .38-caliber bullets, or the .22-caliber expended casings.

Officer John Panabaker searched Mr. Chey's Blazer but did not find any weapons, guns, or ammunition. The rear driver's side window had been damaged by some type of blunt force rather than a bullet.

Detective Brad Alcorn testified that based on the shoe prints, blood drops, the location of the revolver, and the victim's location, he believed the victim went through the fence gap and collapsed. Detective Alcorn testified the revolver had recently been placed there because it appeared the path through the fence gap was frequently traveled and worn. The gun was lying near the center of the path. The blood drops on the gun and plastic bag seemed very fresh and recent. It appeared as if someone who was holding the gun had been bleeding, and either threw or dropped the revolver on the ground.

**The Investigation**

Officer Panabaker interviewed Mr. Chey at the scene that night. Mr. Chey said he drove to the apartment complex with two other people, dropped off "his brother," and had "another brother" in the car with him. Mr. Chey said he pulled into the apartment's driveway and heard five shots, and believed they were fired from a nine millimeter. Mr. Chey stated one of "his brothers" ran out of the vehicle, and his other "brother" stayed inside and took cover. Officer Panabaker testified he had some experience dealing with members of the Cambodian community, and it was common for them to refer to each other as brothers, as if they were talking about their friends. Officer Panabaker testified that Mr. Chey had a slight odor of alcohol but did not appear to be under the influence.

On April 26, 2000, Detective Douglas Stokes was contacted by [Petitioner's] brother, John, who stated that [Petitioner] might have called their sister, Patty. Detective Stokes immediately called Patty Torres, who was "somewhat emotionally upset" and very concerned about [Petitioner]. Ms. Torres said she spoke with [Petitioner], she thought he was suicidal, and she was afraid he was not going to turn himself in. About two minutes into the telephone call, Detective Stokes activated a tape recorder and recorded the rest of his conversation with Ms. Torres.

According to the transcript, Ms. Torres told Detective Stokes she spoke with [Petitioner], and he threatened to shoot himself before he would turn himself in. [Petitioner] was crying and very upset during the telephone call. [Petitioner] said to tell Lisa he wasn't "fucking playing, that I was serious and she was taking it like a fucking joke and I wasn't." [Petitioner] said he was hurting bad because he still loved Lisa but she broke his heart. As the telephone conversation continued, Detective Stokes appeared to summarize what Ms. Torres said before he activated the tape recorder. Stokes commented that [Petitioner] seemed to say that he was scared and didn't mean to kill the guy, and Ms. Torres said yes. Stokes also commented that [Petitioner] said he just wanted to talk to the guy and felt "disrespected" by what Lisa did, and Ms. Torres agreed.

7

Ms. Torres added that [Petitioner] was upset because the guy was married and he didn't know why the guy became involved with Lisa.

> "[Detective Stokes] And so he went up to talk to him and he said the guys were there and the ... and he saw they had some guns in the Blazer.
> "[Ms. Torres] Yeah, they had guns in the Blazer.
> "[Detective Stokes] That's what he's telling you?
> "[Ms. Torres] Yeah, guns. And the other guy had brass knuckles on his ... on his hands, and he got scared. He goes, and I was there all by myself. He goes, I went there to confront him all by myself. He goes, I didn't have nobody with me, and he goes, once I seen that man, he goes, that's it. He goes, shit, I ... I told him hey, what's up man?
> "[Detective Stokes] Why did he ... did he say why he took a gun there to begin with though? I mean, had he not taken....
> "[Ms. Torres] Because his home-boys ... he said his home-boys had told him that they had guns, brass knuckles and ... and crowbars and stuff like that in the Blazer, that they were looking for him all day like crazy. And that was it. That's all he told me...."

Ms. Torres continued to recount the conversation, and that [Petitioner] said Mr. Noy and his two friends were looking for him but [Petitioner] didn't know why.

Detective Stokes advised Ms. Torres that other people said [Petitioner] had been looking for Mr. Noy that week. Ms. Torres said she didn't think [Petitioner] had bad intentions, that he just wanted to talk to Mr. Noy, "face to face, man to man," and ask why Mr. Noy was hurting him.

> "[Detective Stokes] But he ... told you that the only reason that he took a gun there was that he had been told that these other guys had guns?
> "[Ms. Torres] Yeah, had guns and ...
> "[Detective Stokes] And he just wanted to talk to the guys, huh?
> "[Ms. Torres] ... and that he just wanted to talk to the guy, and he went and confronted him all by himself, but when he ... Ny come out, uhm ... his other two friends were waiting for him too, and he (inaudible)"

[Petitioner] repeatedly told Ms. Torres that he was tired, he didn't care anymore, and he would kill himself if the police tried to take him. Detective Stokes advised Ms. Torres to call him immediately if [Petitioner] contacted her again because "we need to get him off the street" before he did something stupid with the gun.

Also on April 26, 2000, Somonn In received a call on his cell phone from an anonymous person, who said that he did what he had to do. Mr. In recognized the caller's voice as the same person who had repeatedly called that week and asked to speak with Mr. Noy. Mr. In subsequently received another call at his house from a different person, and this person threatened him.

[Petitioner] apparently escaped to Mexico. At some point, he tried to return to the United States but was stopped by the Border Patrol. He jumped over the counter and escaped, but left behind his identification papers. [Petitioner] was finally taken into custody in Nogales, Arizona, in February 2002. [Petitioner's] brother and sister testified they had family in Mexico but they didn't know [Petitioner] went there, and they didn't know where he was for two years.

On February 18, 2002, Detective George Von Euw went to Nogales to interview [Petitioner]. [Petitioner] was advised of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 and agreed to answer questions. Detective Von Euw asked [Petitioner] how long he had been in Mexico. [Petitioner] replied: "'I don't know. Two years.'"

*/ / /*

**Additional Prosecution Evidence**

At trial, Lisa Sorn Yim repeatedly testified she never had an affair with Mr. Noy.

Sary Phan, Mr. Noy's wife, testified she never heard Mr. Noy make threats toward [Petitioner] or anyone else related to this incident.

Mr. Chey testified he did not possess a gun, brass knuckles or any weapon on the night of the shooting. He never saw Mr. Noy or Mr. In with such weapons, and he never saw Mr. Noy with a gun. Mr. In similarly testified he never saw Mr. Noy with a gun or any type of weapon. Mr. In testified they didn't have brass knuckles, pipes, or any type of weapon in the Blazer that night, and they never discussed a plan to beat or scare [Petitioner]. Mr. In denied that he told an officer that Mr. Noy said he was going to get a gun to protect himself.

At trial, Patricia Torres, [Petitioner's] sister, denied she spoke with [Petitioner] after the killing or that he made inculpatory admissions. Ms. Torres admitted she spoke to Detective Stokes, but claimed she didn't remember what she told Stokes, and that she lied about everything and made up the inculpatory statements she attributed to [Petitioner] because she was angry at him. Ms. Torres claimed that at the time of the killing, she was angry with [Petitioner] because he owed her $500, he asked to borrow her car, and he called her a bitch during an argument. When Detective Stokes called and asked her about [Petitioner], she lied about [Petitioner's] purported telephone call because she was still angry with [Petitioner]. Ms. Torres knew [Petitioner] had been sad and angry about breaking up with Lisa, and she heard about the shooting from other family members. She relied on these facts to make up the story to Detective Stokes.

On cross-examination, Ms. Torres claimed Lisa told her that Mr. Noy's friends were in a Chevy Blazer and they had weapons. On further examination, Ms. Torres claimed Lisa just told her that Mr. Noy was looking for [Petitioner]. Ms. Torres also claimed she knew about the men in the Blazer because she confronted them.

"Q So, any suggestion that anybody in that Blazer had guns, [Petitioner] didn't tell you ... you made that up.

"A I knew. I knew that they had guns. I knew that Ny had guns.

"Q Really. Who told you that?

"A Because, I just knew.

"Q Who told you that?

"A Nobody told me that."

Ms. Torres claimed "a friend" told her about the men in the Blazer, but she refused to disclose the friend's identity.

Ms. Torres admitted that when she testified at [Petitioner's] preliminary hearing, she denied making any statements to Detective Stokes and she didn't know he had tape-recorded their telephone conversation. She felt Stokes violated her constitutional rights because he didn't tell her about the tape recording.

"Q So your plan was what, that if they ever talked to me about the conversation I had with Detective Stokes on the stand under oath, I'll just lie and say it never happened?

"A Yes. Uh-huh.

"Q It wasn't until you learned that you were on tape that all the sudden now we got a story that I just made that up because I was angry with your brother; is that correct?

"A Correct. [¶] ... [¶]

"Q Once again, you would not have made those statements had you known that your conversation was being taped; isn't that correct? [¶] ... [¶]

"A Correct."

9

Ms. Torres realized she had implicated [Petitioner] in the killing as soon as she finished speaking with Detective Stokes, and she felt bad about it. However, she never called the police and advised them that she lied about [Petitioner's] purported admissions.

**[Petitioner's] Testimony**

[Petitioner] testified at trial against his counsel's advice. [Petitioner] testified that he was in New Mexico when Lisa informed him that she was having an affair with Mr. Noy. [Petitioner] testified that on the morning of April 25, 2000, he went to Lisa's house and tried to reconcile with her. Lisa refused to reconcile and called Mr. Noy while [Petitioner] was there. Lisa threatened to call the police, and [Petitioner] left around noon. [Petitioner] testified he immediately left for Mexico, and he didn't return until he was arrested in this case. [Petitioner] denied shooting Mr. Noy and testified he wasn't at the apartment complex that night.

On cross-examination, [Petitioner] testified that he returned to Fresno from New Mexico on April 21, 2000, and he spoke to Lisa at her mother's house on April 22, 2000. Lisa didn't want anything to do with him and told him to leave. [Petitioner] testified he was just trying to collect his belongings but she threatened to call the police. [Petitioner] testified he never threatened Lisa. [Petitioner] admitted he went back to the home of Lisa's mother, and looked through the rooms for Lisa and the children because "I care about my kids." [Petitioner] testified he saw Lisa at his brother's house on April 24, 2000. He just visited with his children and didn't speak to Lisa because she was angry.

[Petitioner] insisted he never threatened Lisa and he was never angry with her.

"Q During all of this, you never got upset?
"A No, I did not. When I got released,[7] she wasn't a virgin. What was I going to get upset–
"Q You weren't upset because she wasn't a virgin?
"A When I got with her. I got with her in 1991.
"Q Can you explain to me what her status as a virgin or lack of virginity has to do with whether you were upset?
"A You know she had other relationships. [¶] ... [¶]
"Q And the reason you're not upset is because she wasn't a virgin when you got together?
"A Ain't got nothing to do–
"Q That's my question. Why did you bring it up?
"A I'm telling you.
"Q Okay. Were you upset?
"A I was not."

Also on cross-examination, [Petitioner] admitted he went to the homes of various relatives to look for Lisa. [Petitioner] denied he was angry or that he threatened Lisa when he looked for her.

"Q You heard [Kathy Sao] say that you were anything but calm, you were threatening to kill people.
"A That's her. She has mental problems. She takes medication.
"Q Okay. So, you didn't say that. She's in here lying because she has mental problems.
"A Who knows?
"Q Well, I'm asking you.
"A I know she takes medication. I know she hits her kids.

---

[7]     [California Court of Appeal footnote 6:] [Petitioner's] reference to being "released" referred to the fact that he had been in prison in New Mexico in the months before the shooting. While other witnesses mentioned that [Petitioner] had been in New Mexico, the court had excluded evidence as to the reason he was there.

10

1
2

"Q So, we shouldn't believe her testimony in here because she has mental problems and hits her kids?
"A You believe what you want to believe."

3
4

[Petitioner] testified the witnesses who claimed they saw him on the afternoon of April 25th were lying because he left Fresno at noon and arrived in Mexico that night. [Petitioner] left Fresno because Lisa "did it to me," and she didn't care whether the children had a father.

5
6
7

[Petitioner] testified he was "chased out" of Mexico in February 2002. [Petitioner] denied that he previously tried to return to the United States, that he was stopped by the Border Patrol, or that he left his identification and birth certificate at the Border Patrol station. [Petitioner] testified he lost these documents in Mexico and didn't know how they ended up with the Border Patrol.

8

[Petitioner] testified he wanted to be a father to his children, but he left for Mexico to start a new life.

9
10
11

"Q But, despite that, you decided just to leave on the same day that Mr. Noy was shot?
"A I left before that.
"Q On the same day though, right?
"A On the same day."

12
13
14

[Petitioner] admitted "some[one]" called Mr. Noy's wife for him on April 22d, and said her husband was having an affair. Mr. Noy's wife hung up. [Petitioner] called back to get an answer, and she gave him Mr. Noy's telephone number. [Petitioner] called and Somonn In answered, and gave Mr. Noy the telephone. [Petitioner] asked Mr. Noy if he was having an affair with Lisa, and Mr. Noy denied it.

15
16
17

"Q If you don't care, as you've testified to, why are you calling Noy's wife, Noy's employer all looking for Noy?
"A I did not care she had an affair with him, right? I'm trying to get back with her, but I was asking him to see if it was true."

18
19

[Petitioner] denied that he repeatedly contacted Mr. Noy, or that he arranged to meet Mr. Noy on the evening of April 25th to talk things over. On further cross-examination, the prosecutor asked if [Petitioner] still had feelings for Lisa, and [Petitioner] said no. The prosecutor asked why [Petitioner] cried during Lisa's trial testimony, and [Petitioner] said it was for his children.

20
21
22

[Petitioner] denied that he called his sister after the shooting or that he told her anything. [Petitioner] testified he never fired a gun at Mr. Noy because he felt his life was in danger, he was upset about Mr. Noy's affair with Lisa, or he thought Mr. Noy was going to pull a gun at him. [Petitioner] insisted he wasn't there that night and he had already left for Mexico.

**The Stipulations**

23
24

The parties stipulated that Detective Stokes would testify to the following statements made by witnesses when he interviewed them on the night of the shooting and immediately thereafter.

25
26
27
28

Somonn In stated that a couple of days before the shooting, Mr. Noy said "he believed he was going to have to get a gun to protect himself" because he believed [Petitioner] was going to come after him and possibly shoot him. Mr. In said he was in the Blazer with It Chey, and they went to the apartment complex on April 25th because Mr. Noy asked them. Mr. In heard a cracking noise on the side of the vehicle, he looked to his left, and he saw a person standing in the middle of the street and somewhat to the left of the Blazer. Mr. In believed this person was holding a rifle based on the manner in which he held his hands. Mr. In did not state that someone shot at them, the shooter wore

a brown cap, or he heard three shots after the first shot. Mr. In did not state that he heard someone yell before the shots were fired, that Mr. Noy turned after the person yelled, or he saw the shooter run away. Mr. In said Mr. Chey pulled away from the building immediately after the shots stopped. They drove around the block and returned to the apartment building just as the police arrived.

Rann Phan said she saw [Petitioner] at Mr. Noy's apartment building between 3:00 p.m. and 5:00 p.m. that day. [Petitioner] said he was looking for Mr. Noy and needed to talk to him right away. She did not say that [Petitioner] came to her apartment five times, that [Petitioner] threatened her, or that [Petitioner] looked inside her apartment.

Lisa Yim was also interviewed by Detective Stokes, but she did not say that [Petitioner] had threatened to kill Mr. Noy or the children, or that [Petitioner] sent her threatening letters. Lisa's mother did not state that [Petitioner] threatened to kill Lisa or the children.

Sitha Yith stated he did not see who fired the first shots, but he saw three to five young Cambodian males jump inside a blue Honda. Mr. Yith did not see [Petitioner] in the car, but one of the occupants extended his hand and fired a gun into the air two or three times.

Kathy Sao said that Lisa was afraid of [Petitioner] because he threatened her. Ms. Sao refused to tell [Petitioner] where Lisa was because Lisa was afraid of him. [Petitioner] became upset and made some threats about the family trying to protect Lisa, and said: "'You better watch your backs.'" At 9:00 p.m. on April 25th, [Petitioner] appeared at Ms. Sao's apartment and said he was looking for Lisa, and he was going to shoot her for what she did with the neighbor. Ms. Sao said [Petitioner] appeared very upset and was frantically looking for Lisa, but he didn't say that he was looking for Mr. Noy and didn't threaten Mr. Noy. Ms. Sao did not say that [Petitioner] asked her husband for a gun.

(LD 8 at 2-21.)

## PETITIONER'S CLAIMS[8]

1.   "Outrageous governmental misconduct" for redacting trial transcripts, withholding trial testimony, adding testimony, and adding jury instructions (Am. Pet. 19);[9]

2.   Actual innocence (*id.* 19-20);

3.   Petitioner was convicted on less than proof beyond a reasonable doubt (*id.* 20);

4.   Petitioner's conviction was based on false evidence (*id.* 21);

5.   Discriminatory enforcement of law (*id.*);

6.   Insufficient evidence supported Petitioner's conviction (*id.* 22);

7.   Government interference with Petitioner's access to the courts (*id.*);

8.   Insufficient evidence supported Petitioner's conviction (*id.* 23);

---

[8]      Although Petitioner duplicates some of his claims, the Court will analyze each in turn.

[9]      For ease of reference, the Court utilizes the CM/ECF pagination for Petitioner's Amended Petition.

12

9.      Ineffective assistance of appellate counsel (*id.* 23-24);

10.     Jurors gave false answers or covered up false statements during voir dire (*id.* 24);

11.     The prosecution withheld a material witness (*id.* 25);

12.     The prosecution failed to preserve evidence favorable to Petitioner's defense (*id.*);

13.     State court errors denied Petitioner a fair trial (*id.* 26);

14.     Petitioner contends: (1) the prosecution committed misconduct during closing argument, and (2) ineffective assistance of trial counsel to the extent that counsel failed to object to prosecutorial misconduct (*id.*);

15.     Trial court error for failing to instruct on implied malice (*id.* 27);

16.     The trial court erroneously instructed the jury that intent to kill is a required element of voluntary manslaughter (*id.*);

17.     The trial court deprived Petitioner of effective assistance of counsel (*id.*); and

18.     Petitioner's firearm enhancement constituted cruel or unusual punishment under the California Constitution (*id.*).

## **STANDARD OF REVIEW**

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997).  The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

1  Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of

2  state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the

3  time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  To determine

4  what, if any, "clearly established" United States Supreme Court law exists, the court may examine

5  decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669

6  n.6 (9th Cir. 2000).  Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598

7  (9th Cir. 2000) (as amended).  On the other hand, a state court's decision cannot be contrary to, or an

8  unreasonable application of, clearly established federal law if no Supreme Court precedent creates

9  clearly established federal law relating to the legal issue the habeas petitioner raised in state court.

10  *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 127 S. Ct.

11  649, 654 (2006).

12  A state court decision is "contrary to" clearly established federal law if the decision either applies

13  a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result

14  the Supreme Court reached on "materially indistinguishable" facts.  *Early v. Packer*, 537 U.S. 3, 8

15  (2002) (per curiam); *Williams*, 529 U.S. at 405-06.  When a state court decision adjudicating a claim is

16  contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by

17  § 2254(d)(1)." *Williams*, 529 U.S. at 406.  However, the state court need not cite or even be aware of

18  the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court

19  decision contradicts them." *Early*, 537 U.S. at 8.

20  State court decisions which are not "contrary to" Supreme Court law may only be set aside on

21  federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly

22  established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S.

23  at 11 (*quoting* 28 U.S.C. § 2254(d)).  Consequently, a state court decision that correctly identified the

24  governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.

25  *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

26  However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show

27  that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537

28  U.S. at 24-25, 27.  An "unreasonable application" is different from an "erroneous" or "incorrect" one.

1    *Williams*, 529 U.S. at 409-10; *see also Woodford*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 686

2    (2002).

3         A state court factual determination must be presumed correct unless rebutted by clear and

4    convincing evidence.  28 U.S.C. § 2254(e)(1).  Further, a state court's interpretation of state law,

5    including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

6    habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

7                                            **DISCUSSION**[10]

8                                             **Claim One**

9         In his first claim, Petitioner alleges "outrageous governmental misconduct" for redacting trial

10   transcripts, withholding trial testimony of the forensic pathologist, Dr. Glauser, adding testimony of two

11   Fresno police officers, and adding jury instructions to the transcripts on appeal.  (Am Pet. 19.)

12        Petitioner did not raise this claim on direct review, but did raise this claim in habeas petitions

13   before the Fresno County Superior Court, California Court of Appeal, and California Supreme Court.

14   (LD 10-12.)  Because the California Supreme Court denied this claim with citations to *In re Swain* and

15   *People v. Duvall* (*see* LD 12), which indicate Petitioner's failure to allege facts with particularity, *see*

16   *Gaston v. Palmer*, 417 F.3d 1030, 1036-37 (9th Cir. 2005), this Court must "look through" to the last

17   reasoned decision, that of the Fresno County Superior Court on habeas review (*see* LD 10).  *See Ylst v.*

18   *Nunnemaker*, 501 U.S. 797, 803-06 (1991).  In rejecting Petitioner's claim, the superior court stated that

19   "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions."  (LD 10.)

20        The Court agrees with the superior court that Petitioner has provided no objective evidence

21   supporting his claims or how his allegations resulted in a violation of Petitioner's constitutional rights.

22   *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by

23   a statement of specific facts do not warrant habeas relief.").  Petitioner has not shown that the

24   government has redacted, inappropriately, trial transcripts after his conviction.  Even if the trial

25   transcripts were redacted inappropriately, Petitioner was convicted by a jury on proof beyond a

---

26        [10]     Respondent argues that Petitioner's Amended Petition is unexhausted.  (Answer 17-18.)  To the extent that
27   the Amended Petition is unexhausted, the Court considers Petitioner's claims on the merits pursuant to 28 U.S.C. §
     2254(b)(2).  *See Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005) (holding that unexhausted claims may be dismissed
28   pursuant to § 2254(b)(2) "when it is perfectly clear that the applicant does not raise even a colorable claim").

1    reasonable doubt, as discussed in Claim Three, *infra*.  In addition, Petitioner's claims of withheld and

2    supplemented testimony and supplemented jury instructions are not supported by the record, and even

3    if so, Petitioner has not shown how or even if they affected the verdict.  *See Brecht v. Abrahamson*, 507

4    U.S. 619, 631 (1993) (stating that on federal collateral review, trial type errors are reviewed for whether

5    they had a "substantial and injurious effect or influence in determining the jury's verdict").

6        Petitioner cites to *United States v. Russell*, 411 U.S. 423 (1973) for support, but does not explain

7    for what basis.  (Am. Pet. 19.)  To the extent that Petitioner utilizes *Russell* to argue that the "conduct

8    of law enforcement agents is so outrageous that due process principles would absolutely bar the

9    government from invoking judicial processes to obtain a conviction," *Russell*, 411 U.S. at 431-32,

10   Petitioner has failed to show that any of the government's alleged actions, if true, rose to the level of

11   violating due process principles.

12       Accordingly, the Court finds that the California courts' rejection of Petitioner's "outrageous

13   governmental misconduct" claim was neither contrary to, nor an unreasonable application of, clearly

14   established federal law as determined by the United States Supreme Court.  Thus, habeas relief is not

15   warranted on this claim.

16                                    **Claim Two**

17       In his second claim, Petitioner asserts that he is actually innocent, citing *Schlup v. Delo*, 513 U.S.

18   298 (1995).  (Am. Pet. 19-20.)  The Court relies on and agrees with the last reasoned decision on this

19   claim, that of the Fresno County Superior Court on habeas review, which stated that "[P]etitioner has

20   provided no new and/or objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S.

21   at 803-06.

22       Here again, Petitioner fails to provide objective evidence supporting his claim of actual

23   innocence.  *See James v. Borg*, 24 F.3d at 26.  In addition, Petitioner's reliance on *Schlup* is misplaced

24   because *Schlup* permitted a showing of actual innocence to act as a gateway to deciding procedurally

25   defaulted claims on the merits.  *See House v. Bell*, 547 U.S. 518, 536-37 (2006); *Schlup*, 513 U.S. at

26   314-15.  Here, the Court is already addressing Petitioner's claims on the merits, and *Schlup* is

27   inapplicable.  Furthermore, actual innocence as a freestanding claim in a non-capital case cannot be

28   asserted on federal habeas corpus.  *Carriger v. Stewart*, 95 F.3d 755, 757 n.1 (9th Cir. 1996), *vacated*

16

1  *on other grounds*, 132 F.3d 463 (9th Cir. 1997) (en banc); *Coley v. Gonzales*, 55 F.3d 1385, 1387 (9th
2  Cir. 1995).

3       Accordingly, the Court finds that the California courts' rejection of Petitioner's actual innocence
4  claim was neither contrary to, nor an unreasonable application of, clearly established federal law as
5  determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

6                                          **Claim Three**

7       In his third claim, Petitioner contends that he was convicted on less than proof beyond a
8  reasonable doubt of every element of murder.  (Am. Pet. 20.)  Petitioner states that no weapon was
9  recovered, the prosecution witnesses were inconsistent with each other, and Petitioner never owned a
10  car.  (*Id.*)  The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno
11  County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or
12  objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

13       The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be
14  convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime
15  with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  Under *Jackson v. Virginia*, 443
16  U.S. 307 (1979), "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when
17  challenging the sufficiency of the evidence used to obtain a state conviction on federal due process
18  grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Supreme Court has held that "the
19  relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,
20  *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable
21  doubt."  *Jackson*, 443 U.S. at 319; *see also Wright v. West*, 505 U.S. 277, 284 (1992).

22       When the factual record supports conflicting inferences, the federal court must presume, even
23  if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor
24  of the prosecution, and the court must defer to that resolution.  *Jackson*, 443 U.S. at 326.  "*Jackson*
25  cautions reviewing courts to consider the evidence 'in the light most favorable to the prosecution.'"
26  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (*quoting Jackson*, 443 U.S. at 319).  Additionally,
27  "'[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'"
28  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).  The federal court must refer

to the substantive elements of the criminal offense as defined by state law and look to state law to determine what evidence is necessary to convict on the crime charged. *Jackson*, 443 U.S. at 324 n.16; *Juan H.*, 408 F.3d at 1275.

The California standard for determining the sufficiency of evidence to support a conviction has been held by the California Supreme Court to be identical to the federal standard enunciated by the United States Supreme Court in *Jackson*. *See People v. Johnson*, 26 Cal. 3d 557, 576 (1980). In addition, the AEDPA requires the federal court to "apply the standards of *Jackson* with an additional layer of deference." *Juan H.*, 408 F.3d at 1274. The federal court must ask "whether the decision of the California Court of Appeal reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of this case." *Id.* at 1275 & n.13.

In California, murder is defined as the "unlawful killing of a human being, or a fetus, with malice aforethought." Cal. Penal Code § 187(a) (1996). California Penal Code section 189 defines first degree murder:

> All murder which is perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or . . . any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.
> . . . .
> To prove the killing was "deliberate and premeditated," it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act.

Cal. Penal Code § 189 (1999). In addition, California Penal Code section 12022.53(d) explains Petitioner's firearm enhancement:

> Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a) [such as murder] . . . and who in the commission of that felony intentionally and personally discharged a firearm and proximately caused great bodily injury . . . or death, to any person other than an accomplice, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony.

Cal. Penal Code § 12022.53(d) (1998).

Here, the trial court instructed the jury on California Jury Instructions - Criminal ("CALJIC") 2.90, which reiterates that a defendant is presumed innocent and that the state has the burden of proving

18

1    a defendant guilty beyond a reasonable doubt.  (*See* Additional Clerk's Tr. ("ACT") 154.)  The evidence

2    shows that Petitioner repeatedly threatened to kill Lisa Yim and Ny Noy, whom Petitioner suspected was

3    having an affair with Yim.  (4 Rep.'s Tr. ("RT") 387, 397-98; 5 RT 424-25, 492-93, 495-96, 500, 511-

4    12.)  Petitioner inquired about obtaining a gun, which contributed to Yim applying for a restraining

5    order.  (5 RT 426, 494-95.)  On the day Noy was shot and killed, Petitioner actively looked for Noy and

6    appeared angry and threatening (4 RT 387, 397-99, 409-12); later that evening, Noy was shot in the back

7    (3 RT 212-15).  The following day, Petitioner told Somonn In "I did what I got to do."  (5 RT 514, 563.)

8    Petitioner also told his sister that he shot Noy because he was afraid of two others who were allegedly

9    armed.  (6 RT 589, 599, 601-02.)  Petitioner thereafter fled to Mexico and remained there for two years.

10   (*Id.* 581.)  The jury was entitled to credit the aforementioned compelling evidence and to disbelieve

11   Petitioner's testimony denying responsibility.  (*See id.* at 685-86, 697-99; LD 8 at 39-43, 46-48 (court

12   of appeal opinion on direct review detailing evidence supporting first degree murder)); *see also Jackson*,

13   443 U.S. at 326; *Walters*, 45 F.3d at 1358.

14         Accordingly, viewing the evidence in the light most favorable to the prosecution and presuming

15   the jury resolved all conflicting inferences from the evidence against Petitioner, the Court finds that a

16   rational trier of fact could find the essential elements of first degree murder, including wilfulness,

17   deliberation, and premeditation by Petitioner, beyond a reasonable doubt.  *Jackson*, 443 U.S. at 326;

18   *Walters*, 45 F.3d at 1358.  Furthermore, a rational trier of fact could find beyond a reasonable doubt that

19   during the commission of the first degree murder, Petitioner intentionally and personally discharged a

20   firearm that caused death.

21         Based on the foregoing, the Court finds that the California courts' rejection of Petitioner's

22   insufficient evidence claim was neither contrary to, nor an unreasonable application of, clearly

23   established federal law as determined by the United States Supreme Court.  Thus, habeas relief is not

24   warranted on this claim.

25                                      **Claim Four**

26         In his fourth claim, Petitioner contends that he was convicted based on evidence known to be

27   false.  (Am. Pet. 21.)  Specifically, Petitioner claims he was convicted "because [he] refused all offers,

28   even one of pointing the fingers at the prosecutor's 'potential witnesses,'" It Chey, Sommon In, and

                                            19

Sitha Yith. (*Id.*) Petitioner also states that he was offered three years to say things he did not know were true and alleges that the trial judge, his attorney, and the prosecutor exhibited bias and prejudice. (*Id.*) The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions." (LD 10); *Ylst*, 501 U.S. at 803-06.

The State may not use false evidence to obtain a criminal conviction, and "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see Giglio v. United States*, 405 U.S. 150, 153-54 (1972). The State violates a criminal defendant's right to due process of law when, although not soliciting false evidence, the State allows false evidence to go uncorrected when it appears. *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (*citing Alcorta v. Texas*, 355 U.S. 28 (1957) and *Pyle v. Kansas*, 317 U.S. 213 (1942)).

However, any false testimony must be material. *Id.* at 984. "In assessing materiality under *Napue*, we determine whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury'; if so, then 'the conviction must be set aside.'" *Id.* (citation and internal quotation marks omitted); *see United States v. Agurs*, 427 U.S. 97, 103 (1976). Under this materiality standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (*quoting Kyles v. Whitley*, 514 U.S. 419, 434 (1995)) (citation and internal quotation marks omitted).

Here, there is no evidence that the prosecution presented false evidence against Petitioner, or that somehow It Chey, Sommon In, or Sitha Yith, instead of Petitioner, murdered the victim. "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d at 26. In addition, as discussed under Claim Three, *supra*, sufficient evidence supported Petitioner's conviction. Petitioner's claim of bias and prejudice is similarly unsupported by any evidence.

Accordingly, the Court finds that the California courts' rejection of Petitioner's false evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

1    determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

2                                          **Claim Five**

3        In his fifth claim, Petitioner contends "discrimination in enforcement of law," citing *Yick Wo v.*

4    *Hopkins*, 118 U.S. 356 (1886).  (Am. Pet. 21.)  The Court relies on and agrees with the last reasoned

5    decision on this claim, that of the Fresno County Superior Court on habeas review, which stated that

6    "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions." (LD 10);

7    *Ylst*, 501 U.S. at 803-06.

8        "The government retains broad discretion as to whom to prosecute." *Belmontes v. Brown*, 414

9    F.3d 1094, 1126 (9th Cir. 2005) (*citing Wayte v. United States*, 470 U.S. 598, 607 (1985)), *rev'd on*

10   *other grounds*, *Ayers v. Belmontes*, 549 U.S. 7 (2006).  However, "[t]he decision to prosecute may not

11   be based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including

12   the exercise of protected statutory and constitutional rights." *Id.* (*citing United States v. Armstrong*, 517

13   U.S. 456, 464 (1996) and *Wayte*, 470 U.S. at 608).  "In order to prevail on a selective prosecution claim,

14   a defendant must show that the prosecutorial policy both had a discriminatory effect and was motivated

15   by a discriminatory purpose." *Id.*

16       Here, Petitioner again provides no evidence to support his claim.  Petitioner does not show that

17   the prosecutorial policy both had a discriminatory effect and was motivated by a discriminatory purpose.

18   *See id.*; *see also James v. Borg*, 24 F.3d at 26.

19       Accordingly, the Court finds that the California courts' rejection of Petitioner's discrimination

20   claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

21   determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

22                                          **Claim Six**

23       In his sixth claim, Petitioner contends that there was insufficient evidence to establish guilt

24   beyond a reasonable doubt.  (Am. Pet. 22.)  The Court relies on and agrees with the last reasoned

25   decision on this claim, that of the Fresno County Superior Court on habeas review, which stated that

26   "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions." (LD 10);

27   *Ylst*, 501 U.S. at 803-06.

28       As discussed in Claim Three, *supra*, sufficient evidence supported Petitioner's conviction.

                                               21

1   Accordingly, the Court finds that the California courts' rejection of Petitioner's insufficient evidence

2   claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

3   determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

4                                                    **Claim Seven**

5         In his seventh claim, Petitioner contends that the government interfered with his access to the

6   courts.  (Am. Pet. 22.)  Specifically, Petitioner states that the California Department of Corrections and

7   Rehabilitation tried to stop Petitioner from filing his petitions for relief.  (*Id.*)  The Court relies on and

8   agrees with the last reasoned decision on this claim, that of the Fresno County Superior Court on habeas

9   review, which stated that "[P]etitioner has provided no new and/or objective evidence supporting any

10  of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

11        "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that

12  custody, and . . . the traditional function of the writ is to secure release from illegal custody."  *Preiser*

13  *v. Rodriguez*, 411 U.S. 475, 484 (1973); *Burnett v. Lampert*, 432 F.3d 996, 999 (2005).  Indeed, the writ

14  of habeas corpus "is limited to attacks upon the legality or duration of confinement."  *Crawford v. Bell*,

15  599 F.2d 890, 891 (9th Cir. 1979) (*citing Preiser*, 411 U.S. at 484-86).  Thus, a "[civil rights] action is

16  a proper remedy for a . . . prisoner who is making a constitutional challenge to the conditions of his

17  prison life, but not to the fact or length of his custody."  *Preiser*, 411 U.S. at 499.

18        That "is not to say that habeas corpus may not also be available to challenge such prison

19  conditions," as habeas corpus could be a "concurrent federal remed[y] in prison conditions cases" along

20  with a civil rights action.  *Id.* at 499 & n.15.  In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court

21  stated that it would leave "to another day the question of the propriety of using a writ of habeas corpus

22  to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement

23  itself."  441 U.S. at 526 n.6.  Yet by 2004, in *Muhammad v. Close*, 540 U.S. 749 (2004) (per curiam),

24  the Supreme Court stated that it "has never followed the speculation in *Preiser* . . . that such a prisoner

25  subject to 'additional and unconstitutional restraints' might have a habeas claim independent of [a civil

26  rights action] . . . ."  540 U.S. at 752 n.1; *but see Nelson v. Campbell*, 541 U.S. 637, 646 (2004) (stating

27  that some "civil rights damages actions . . . fall at the margins of habeas").

28        Here, Petitioner does not challenge the "fact or length of his custody."  Instead, Petitioner alleges

                                                            22

1   that prison officials restricted his access to courts by impeding his ability to file petitions for relief,

2   which is properly construed as a challenge to prison conditions.  The Ninth Circuit has characterized

3   challenges to prison conditions as appropriately cognizable in civil rights actions.  *See Badea v. Cox*,

4   931 F.2d 573, 574 (9th Cir. 1991) (*citing Preiser*, 411 U.S. at 498-99); *Crawford v. Bell*, 599 F.2d 890,

5   891-92 (9th Cir. 1979) (*citing Preiser*); *cf.* 42 U.S.C. § 1997e (setting forth screening procedure of civil

6   rights actions challenging prison conditions).  Even if Petitioner could bring this claim in a habeas

7   petition, he does not provide any evidence in support of being denied access to the courts, especially in

8   light of the timely filing of his federal Petition.  *See James v. Borg*, 24 F.3d at 26.

9       Accordingly, the Court finds that the California courts' rejection of Petitioner's access to courts

10  claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

11  determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

12                          **Claim Eight**

13      In his eighth claim, Petitioner contends that he was "bound over to superior court" on evidence

14  that was insufficient to establish his guilt beyond a reasonable doubt.  (Am. Pet. 23.)  The Court relies

15  on and agrees with the last reasoned decision on this claim, that of the Fresno County Superior Court

16  on habeas review, which stated that "[P]etitioner has provided no new and/or objective evidence

17  supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

18      As discussed in Claim Three, *supra*, sufficient evidence supported Petitioner's conviction.

19  Accordingly, the Court finds that the California courts' rejection of Petitioner's insufficient evidence

20  claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

21  determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

22                          **Claim Nine**

23      In his ninth claim, Petitioner claims ineffective assistance of appellate counsel.  (Am. Pet. 23.)

24  Specifically, Petitioner claims his appellate counsel (1) was "in conspiracy" with the Fresno County

25  Superior Court to keep him in prison for life, and (2) failed to raise a claim that trial testimony was

26  tampered and continued Petitioner's direct appeal without the "missing" trial transcript pages.  (*Id.* 23-

27  24.)  The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno

28  County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or

1    objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

2         For a petitioner to prevail on an ineffective assistance of counsel claim, he must show: (1) that

3    counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.

4    *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A court evaluating an ineffective assistance of

5    counsel claim does not need to address both components of the test if the petitioner cannot sufficiently

6    prove one of them.  *Id.* at 697; *Thomas v. Borg*, 159 F.3d 1147, 1151-52 (9th Cir. 1998).

7         To prove deficient performance, a petitioner must show that counsel's representation fell below

8    an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  Because of the difficulty in

9    evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the

10   wide range of reasonable professional assistance."  *Id.* at 689.  Only if counsel's acts or omissions,

11   examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally

12   competent assistance will the petitioner prove deficient performance.  *Id.* at 690; *United States v.*

13   *Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  The petitioner must overcome the presumption

14   that, under the circumstances, the challenged action "might be considered sound trial strategy."

15   *Strickland*, 466 U.S. at 689.

16        Establishing counsel's deficient performance does not warrant setting aside the judgment if the

17   error had no effect on the judgment.  *Id.* at 691; *Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998).  A

18   petitioner must show prejudice such that there is a reasonable probability that, but for counsel's

19   unprofessional errors, the result would have been different.  *Strickland*, 466 U.S. at 694.  Thus, the

20   petitioner will only prevail if he can prove that counsel's errors resulted in a "proceeding [that] was

21   fundamentally unfair or unreliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

22        The Strickland standard also applies to claims of ineffective assistance of appellate counsel.

23   *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).  Appellate counsel does not have a constitutional duty

24   to raise every non-frivolous issue requested by a defendant.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

25   Counsel "must be allowed to decide what issues are to be pressed"; otherwise, the ability of counsel to

26   present the client's case in accord with counsel's professional evaluation would be "seriously

27   undermined."  *Id.*  There is, of course, no obligation to raise meritless arguments on a client's behalf.

28   *See Strickland*, 466 U.S. at 687-88.

1    Here, Petitioner fails to provide evidence that his appellate counsel was "in conspiracy" with the

2    Fresno County Superior Court to keep Petitioner "incarcerated in prison for life."   *See Jackson v.*

3    *Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000) (finding unsupported speculation and conclusory

4    allegations regarding an attorney's substandard performance are not sufficient to show either deficient

5    performance or prejudice); *James v. Borg*, 24 F.3d at 26.   In addition, Petitioner's claim that appellate

6    counsel failed to raise "issues of tampering with trial testimony" is without merit because Petitioner

7    provides no evidence and the Court has found none that the trial transcripts were tampered.   Regardless,

8    appellate counsel made a reasonable strategic decision not to include an unsupported tampering claim

9    and to focus on stronger claims.  *See infra* Claims 14-18 (claims brought in state appellate court); *Jones*,

10   463 U.S. at 751.   As a result, Petitioner identifies no grounds establishing ineffective assistance of

11   appellate counsel based on failure to assert the tampering claim on direct appeal, as an attorney does not

12   provide ineffective assistance for failing to raise meritless claims on appeal.   *See Wildman v. Johnson*,

13   261 F.3d 832, 840-42 (9th Cir. 2001) (finding appellate counsel's failure to raise issues on direct appeal

14   does not constitute ineffective assistance when appeal would not have provided grounds for reversal).

15   Based on the foregoing, Petitioner has failed to show trial or appellate counsel's performance

16   was deficient.   *Strickland*, 466 U.S. at 687-88.   Moreover, even if trial or appellate counsel's

17   performance was deficient, Petitioner has failed to show the result of the trial or appeal would have been

18   any different.  *Id.*

19   Accordingly, the Court finds that the California courts' rejection of Petitioner's ineffective

20   assistance of appellate counsel claim was neither contrary to, nor an unreasonable application of, clearly

21   established federal law as determined by the United States Supreme Court.   Thus, habeas relief is not

22   warranted on this claim.

23                              **Claim Ten**

24   In his tenth claim, Petitioner states that the "jurors gave intentionally false answers" or "covered

25   up false statements" during voir dire.   (Am. Pet. 24 (*citing Irvin v. Dowd*, 366 U.S. 717 (1961).)

26   Specifically, Petitioner claims a juror was deliberately removed after she notified the trial court that her

27   brother-in-law, who worked as an "I. Bureau technician," often told her about crime scenes, including

28   potentially the crime scene in the instant case.  (*Id.*; *see* 3 RT 263-64, 272-75.)  Petitioner contends this

                              25

1    juror ("Juror #6," *see* 3 RT 263) knew facts favorable to Petitioner and for that was removed.  (Am. Pet.

2    24.)  The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno

3    County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or

4    objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

5           Here, the facts in the record do not support Petitioner's assertions.  To the extent that Petitioner

6    claims that Juror #6 "gave intentionally false answers" or "covered up false statements" during voir dire,

7    that did not have a "substantial and injurious effect or influence in determining the jury's verdict"

8    because Juror #6 was excused and did not participate in jury deliberations.  (*See* 4 RT 284-85); *see also*

9    *Brecht*, 507 U.S. at 631.  In addition, to the extent that Petitioner contends the prosecution removed

10   Juror #6 because she allegedly knew facts favorable to Petitioner, that too is unsupported by the record

11   because both the prosecution and defense counsel stipulated that Juror #6 be excused because she was

12   "trying to get out of this trial."  (4 RT 284-85.)

13          Accordingly, the Court finds that the California courts' rejection of Petitioner's juror misconduct

14   claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

15   determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

16                                        **Claim Eleven**

17          In his eleventh claim, Petitioner contends a material witness was made unavailable by the

18   prosecution.  (Am. Pet. 25.)  Specifically, Petitioner claims Dr. Glauser's testimony was deleted from

19   the trial transcripts on appeal and that Detective Stokes was the material witness made unavailable by

20   the prosecution.  (*Id.*)  The Court relies on and agrees with the last reasoned decision on this claim, that

21   of the Fresno County Superior Court on habeas review, which stated that "[P]etitioner has provided no

22   new and/or objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

23          Again, Petitioner makes unsupported allegations of prosecutorial misconduct.  As discussed in

24   Claims One and Nine, *supra*, Petitioner provides no evidence that the prosecution tampered with the trial

25   transcripts on appeal.  Even assuming tampering, sufficient evidence supported Petitioner's conviction.

26   *See supra* Claim Three.  To the extent Petitioner claims the prosecution or the trial court failed to

27   preserve testimony for appeal and that this prejudiced his appeal, the Court addresses this in Claim

28   Twelve, *infra*.  As for Petitioner's claim that the prosecution made Detective Stokes unavailable to

                                                26

1   testify, the record indicates that both the prosecution and defense counsel stipulated as to Stokes'

2   testimony if recalled to the stand.  (*See* 6 RT 711-16.)

3       Accordingly, the Court finds that the California courts' rejection of Petitioner's prosecutorial

4   misconduct claim was neither contrary to, nor an unreasonable application of, clearly established federal

5   law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

6   claim.

7                                   **Claim Twelve**

8       In his twelfth claim, Petitioner claims the prosecution failed to preserve favorable evidence for

9   Petitioner on appeal. (Am. Pet. 25.) Specifically, Petitioner states the prosecution failed to preserve trial

10  testimony and jury instructions for his appeal.  (*Id.*)  The Court relies on and agrees with the last

11  reasoned decision on this claim, that of the Fresno County Superior Court on habeas review, which

12  stated that "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions."

13  (LD 10); *Ylst*, 501 U.S. at 803-06.

14      A trial court's failure to record portions of a trial violates due process only if the record is such

15  that the defendant cannot effectively appeal his conviction.  *See Madera v. Risley*, 885 F.2d 646, 648

16  (9th Cir. 1989) (*citing Britt v. North Carolina*, 404 U.S. 226 (1971)).  The Ninth Circuit considers "(1)

17  the value of the transcript to the defendant in connection with the appeal or trial for which it is sought,

18  and (2) the availability of alternative devices that would fulfill the same functions as a transcript."  *Id.*

19  (citation and internal quotation marks omitted).  In addition, a habeas petitioner must establish prejudice

20  from the absence of the transcripts.  *Id.* at 649.

21      As discussed, Petitioner does not to show the prosecution committed misconduct or failed to

22  preserve portions of the transcript on appeal.  To the extent Petitioner refers to Dr. Glauser's testimony

23  and that it was the trial court that failed to record the testimony, Petitioner does not show that, assuming

24  the testimony was of value and that there were no other alternative devices, he was prejudiced by the

25  lack of Dr. Glauser's testimony.  *See Madera*, 885 F.2d at 649.  Sufficient evidence supported

26  Petitioner's conviction.  *See supra* Claim Three.  In addition, Dr. Glauser's testimony appeared to relate

27  to the victim's autopsy and/or cause of death, which was never seriously in dispute.  (*See* 3 RT 275-76);

28  *see also Brecht*, 507 U.S. at 631.

                                        27

1   Accordingly, the Court finds that the California courts' rejection of Petitioner's preservation of

2   evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal

3   law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

4   claim.

5   ### Claim Thirteen

6   In his thirteenth claim, Petitioner asserts that state court errors denied him a fair trial.  (Am. Pet.

7   26.)  Specifically, Petitioner alleges that fifteen sidebars, seventeen short recesses, five pauses in the

8   proceedings, three "discussions held off the record," and four "requested portions of the record read back

9   by the reporter" constituted a violation of due process.  (*Id.*)  The Court relies on and agrees with the last

10   reasoned decision on this claim, that of the Fresno County Superior Court on habeas review, which

11   stated that "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions."

12   (LD 10); *Ylst*, 501 U.S. at 803-06.

13   "[T]he category of infractions that violate fundamental fairness" is a very narrow one.  *Estelle*

14   *v. McGuire*, 502 U.S. 62, 72-73 (1991) (citation and internal quotation marks omitted).  Here, Petitioner

15   fails to show how breaks in the trial court proceedings violated fundamental fairness or Petitioner's due

16   process rights.

17   Accordingly, the Court finds that the California courts' rejection of Petitioner's state court error

18   claim was neither contrary to, nor an unreasonable application of, clearly established federal law as

19   determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

20   ### Claim Fourteen

21   In his fourteenth claim, Petitioner contends that the prosecutor committed misconduct in closing

22   arguments by "asking jurors to convict out of sympathy for the victim, in asking for retribution and in

23   commenting negatively on [Petitioner's] demeanor during the trial."  (Am. Pet. 26.)  Petitioner states

24   that to the extent that this claim is waived by counsel's failure to object, Petitioner was deprived of

25   effective assistance of trial counsel.  (*Id.*)  Because the Court addresses the prosecutorial misconduct

26

27

28

1   claim on the merits,[11] the Court need not address Petitioner's claim of ineffective assistance for trial

2   counsel's failure to object.

3        The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno

4   County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or

5   objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.  Because the

6   California Court of Appeal on direct review addressed the merits of this claim in a more detailed, yet

7   still consistent, opinion than the superior court on habeas review, the Court also utilizes the court of

8   appeal's opinion in its analysis.  (*See* LD 8 at 50-56.)  In denying Petitioner's prosecutorial misconduct

9   claim, the court of appeal stated:

10   ### PROSECUTORIAL MISCONDUCT

11       [Petitioner] raises three instances of alleged prosecutorial misconduct based on the prosecutor's rebuttal argument. . . .

    **A.**    **Background**

12       [T]he prosecutor's closing argument focused on evidence of [Petitioner's] intent to kill, and he argued there was overwhelming evidence of first degree premeditated

13   murder. Defense counsel asserted the circumstantial evidence was equally supportive of [Petitioner's] innocence, the prosecution's witnesses were inconsistent and had motives

14   to lie, and Mr. Noy was likely the victim of a stray bullet fired by one of his friends.

15       [Petitioner] raises three instances of alleged prosecutorial misconduct based on the final paragraphs of the prosecutor's rebuttal argument. The prosecutor again

16   summarized the evidence that [Petitioner] committed premeditated and intentional first degree murder, and there was only one explanation for the evidence. He continued:

17         "[THE PROSECUTOR:] I want you [sic] to let you go and get to your job. I want to mention something in this case, actually, I'll end with this:

18   Throughout the trial across from me, directly across from you has been [Petitioner] and his counsel. Over here I've been sitting here through the

19   trial. *Next to me has been an empty chair, actually a couple of them*. I'm pointing that out because you have not and never could hear from Ny Noy

20   in this case. It's easy to forget about Ny Noy, because he's dead. Two and a half years ago he died. He was murdered.

21         "There's a book that I read recently called the 'Killing of Bonnie Garland, A Question Of Justice.' In the preface to that book, the introduction,

22   there's a paragraph that talks about, for lack of a better word, *of the injustice that can come around because the victim gets lost in all this*. I'd

23   like to actually read that quote to you because I think it is a powerful and it applies to this case. So, if you'd bear with me, it's fairly short.

24         "[DEFENSE COUNSEL]: Your Honor, I'm going to object to this

25   ──────────────────

26       [11]    Respondent argues that Petitioner's prosecutorial misconduct claimed is procedurally defaulted.  (Answer 32, 36-38.)  When the claims raised in a habeas petition are easier to resolve on the merits, the interests of judicial economy counsel against deciding the more complex or uncertain procedural default issues.  *See Franklin v. Johnson*, 290 F.3d 1223,

27   1232 (9th Cir. 2002) (*citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)); *see also Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982).  Because such a situation exists here, the Court will address Petitioner's prosecutorial misconduct claim

28   on the merits.

portion of the testimony as appealing for sympathies for the victim.
"THE COURT: Sustained. I think it is outside the realm of argument. Sustained.
"[THE PROSECUTOR]: Let me phrase it this way then. Ny Noy might not have been able to walk in this courtroom, go up to that chair and take the same oath everybody else took and told you what happened on April 25th, but he has actually, from the grave, has been able to do that in several ways." (Italics added.)

[Petitioner's] first assignment of error is based on the above-italicized language: he asserts the prosecutor improperly appealed to the jury to have sympathy for the victim, and to have an emotional rather than objective response to the evidence.
    [Petitioner's] next assignment of misconduct is based on the prosecutor's comments which immediately followed the above argument.

"You have heard from various witnesses what Ny Noy was going through in the days leading up to April 25th. *You heard the fact there was this man, [Petitioner] right over here, the one that keeps staring at me through this trial, who has been smirking throughout the entire case.* This man was even calling his wife making threats. You know what Ny Noy was going through leading up to his murder. You know he was seeing it coming. You know that he was concerned that this person was actually going to carry out the threats he was making to his family and friends that he was going to murder him." (Italics added.)

[Petitioner's] second assignment of error is that this italicized language constituted improper comment on his demeanor.
    [Petitioner's] final assignment of misconduct is based on the balance of the prosecutor's rebuttal, which immediately followed the above-quoted portion.

"Just because [Mr. Noy is] not in this courtroom, just because that man murdered him doesn't mean you don't know from the evidence what was going on with Ny Noy, what led up to his death and who perpetrated it. *Whether it was rash or not, you know murder doesn't make a whole lot of sense when you step outside of it and look at it. But, what you know is that this man, this guy right here, because of his beliefs about an affair and his injured pride, made a conscious decision to get a rifle, to go to ... South Dearing, to point that thing at a living, breathing human being named Ny Noy and pull the trigger repeatedly. And you know that because of his choice to make those actions to engage in that conduct, Ny Noy's life ended. It was snuffed out by him, and the evidence in this case cannot take you anywhere else but there. That and that alone is why I'm asking you to return first degree murder ... conviction. There is one verdict.* [¶] I'll let you get to your job. Thank you very much." (Italics added)

[Petitioner's] third assignment of misconduct is that the italicized language constituted an improper appeal for the jury to base its verdict on retribution.

**B.    Analysis**

    [Petitioner] asserts the prosecutor committed prejudicial misconduct based on the three separate instances italicized above. [Petitioner] also asserts the entirety of the prosecutor's rebuttal argument demonstrated his "larger and more insidious plan to incite the jurors to convict [Petitioner] of first degree murder because he had been threatening persons, and sneering at trial, and had shot Mr. Noy," which began by the appeal for sympathy.

Although a prosecutor's misstatement or mischaracterization of evidence or reference to facts not in evidence constitutes misconduct (*People v. Hill* (1998) 17 Cal.4th 800, 823-829), during closing argument counsel is accorded wide latitude to urge whatever conclusions can properly be drawn from the evidence. (*People v. Thomas* (1992) 2 Cal.4th 489, 526.) A prosecutor is entitled during argument to make reasonable deductions from the evidence and to draw reasonable inferences from the testimony, and is not limited to "'''Chesterfieldian politeness.''''" (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)

"The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'''' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.''" [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

. . . .

[Petitioner] raises three claims of prosecutorial misconduct: (1) appeals for sympathy for the victim, (2) comments on [Petitioner's] demeanor, and (3) appeals for retribution against [Petitioner]. As for the first basis, it is well established that an appeal for sympathy for the victim is inappropriate during an objective determination of guilt. (*People v. Fields* (1983) 35 Cal.3d 329, 362.) But the prosecutor's remarks herein were relatively brief and merely purported to ask on the victim's behalf for a fair verdict, and the court immediately sustained defense counsel's objection. These "brief and relatively bland" references were not misconduct. (Cf. *People v. Sanders* (1995) 11 Cal.4th 475, 527.)

As for comments on [Petitioner's] credibility and demeanor, the prosecutor is permitted to urge, in colorful terms, that defense witnesses—including a testifying defendant—are not entitled to credence, and to argue on the basis of inference from the evidence that a defense is fabricated. (*People v. Earp, supra*, 20 Cal.4th at pp. 862-863.) [Petitioner] relies on *People v. Heishman* (1988) 45 Cal.3d 147, and argues the prosecutor's references to his smirks and stares were improper. *Heishman* held that "prosecutorial references to a *nontestifying* defendant's demeanor or behavior in the courtroom" are "improper on three grounds: (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness. (2) The prosecutorial comment infringes on the defendant's right not to testify. (3) Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character." (*Id.* at p. 197, italics added.)

Since [Petitioner] testified, however, the argument at issue was only improper based on the third factor set forth in *Heishman*. If the prosecutor suggested the jury should convict [Petitioner] based on his courtroom demeanor, he then committed misconduct. But it is difficult to reach such a conclusion from this brief reference to his demeanor. Of course, [Petitioner's] decision to testify at trial reduced any potential harm to his Fifth Amendment rights from this argument. (See, e.g., *People v. Boyette* (2002)

31

29 Cal.4th 381, 434-435.) [Petitioner's] credibility was undermined not by the prosecutor's comments on his demeanor, but through his trial testimony that all the prosecution witnesses were lying about his repeated threats against Mr. Noy, he was not near the apartment building just before the murder, and he happened to leave for Mexico just hours before Mr. Noy was murdered.

> "... When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Berryman, supra,* 6 Cal.4th at p. 1072.)

On the record here, the answer is no. The court instructed the jury that statements by attorneys are not evidence. (CALJIC No. 1.02.) Since we presume that the jury followed the court's instructions, no reasonable likelihood exists that the prosecutor's comments misled the jury. (*People v. Smithey* (1999) 20 Cal.4th 936, 961.) Even if the prosecutor's brief comments on his demeanor were improper, they were neither deceptive or reprehensible.

[Petitioner] claims the prosecutor's final rebuttal comments appealed to the jury to return a verdict based on retribution against [Petitioner]. In the context of capital cases, the California Supreme Court has held: "Isolated, brief references to retribution or community vengeance ..., although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty." (*People v. Ghent* (1987) 43 Cal.3d 739, 771.) In *People v. Wash* (1993) 6 Cal.4th 215, the court rejected defendant's claim of misconduct based on the prosecutor's argument in which he urged the jury "'to make a statement,'" to do "'the right thing'" and to restore "'confidence'" in the criminal justice system by returning a verdict of death. (*Id.* at pp. 261-262.)

In light of *Wash*, the prosecutor's comments herein were neither inflammatory nor the principal basis of his argument in favor of a first degree murder verdict. The prosecutor did not use deceptive or reprehensible methods to attempt to persuade the jury, and his comments did not render the trial fundamentally unfair. In any event, the jurors were instructed that they "must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," and that, if the attorneys said anything during their arguments that conflicted with the court's instructions, the jurors must follow the instructions. (CALJIC No. 1.00.) We presume they did so, and [Petitioner] was not prejudiced by the prosecutor's comment.

(LD 8 at 50-56.)

A habeas petition alleging prosecutorial misconduct will be granted only when the misconduct did "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Under *Darden*, the first issue is whether the prosecutor's remarks or conduct were improper; if so, the next issue is whether such remarks or conduct infected the trial with unfairness. *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (*citing*

1   *Darden*, 477 U.S. at 181).

2          A prosecutor is permitted to argue reasonable inferences from the evidence. *Duckett v. Godinez*,

3   67 F.3d 734, 742 (9th Cir. 1995). "Counsel are given latitude in the presentation of their closing

4   arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented

5   and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996); *see*

6   *also United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) (noting that prosecutor's characterization

7   of defense theory as a "fabrication" fell "well within the bounds of acceptable comment"). The Court

8   views a prosecutor's challenged remarks in the context of the entire trial. *See Greer*, 483 U.S. at 765-66;

9   *see also Donnelly*, 416 U.S. at 639-43.

10         The Court agrees with the court of appeal's analysis that the prosecutor committed no

11  misconduct. With regard to Petitioner's claim that the prosecutor appealed for sympathy to the victim,

12  the prosecutor was only asking for a fair verdict and for the jury to remember that there was a victim in

13  the case who could not testify. (*See* 7 RT 832-33.) Thus, the prosecutor's brief comments were not

14  improper. *See Tak Sun Tan*, 413 F.3d at 1112; *see also Drayden v. White*, 232 F.3d 704, 713 (9th Cir.

15  2000) (holding that prosecutor's creation of a fictitious character based on the dead victim and delivering

16  closing argument in the voice of that character is not a denial of due process because his statements were

17  supported by the evidence and reasonable inferences therefrom).

18         Even assuming the comments regarding the victim were improper, they did not "so infect[] the

19  trial with unfairness." *Darden*, 477 U.S. at 181. Immediately after the prosecutor's brief comments, the

20  trial judge sustained defense counsel's objection. (7 RT 833.) Furthermore, the trial court instructed

21  the jurors that their decision was to be based only on the evidence produced in court (*see* ACT 1), and

22  the jurors were specifically admonished that counsel's statements were not evidence (*see id.* 4). The jury

23  was also instructed not to be influenced by "sentiment, conjecture, sympathy, passion, prejudice, public

24  opinion or public feeling." (ACT 2.) During closing argument, the prosecutor warned the jurors that

25  his statements, and those of defense counsel, were not evidence. (7 RT 758.) These admonishments and

26  instructions significantly limited any prejudice cause by the prosecutor's remarks. *See Weeks v.*

27  *Angelone*, 528 U.S. 225, 234 (2000) (stating jury is presumed to have followed court's instructions);

28  *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999) (finding prosecutor's improper statements did

not render trial fundamentally unfair because prosecutor told jury that his arguments were not evidence, and because the government presented a strong case against the defendant); *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (holding prosecutor's improper comments were isolated moments in a three day trial, and their effect was mitigated by judge's instructions that closing arguments were not evidence, and the strong proof of the defendant's guilt). Moreover, as discussed in Claim Three, *supra*, sufficient evidence supported Petitioner's conviction.

The prosecutor also did not comment improperly on Petitioner's demeanor. (*See* 7 RT 834 ("[Petitioner] . . . keeps staring at me [the prosecutor] through this trial, who has been smirking throughout the entire case.").)   The prosecutor's brief comment regarding Petitioner's courtroom demeanor was permissible because Petitioner chose to testify. (*See* 6 RT 684); *Allen v. Woodford*, 395 F.3d 979, 997 (9th Cir. 2005); *see United States v. Schuler*, 813 F.2d 978, 981 n.3 (9th Cir. 1987) ("When a defendant chooses to testify, a jury must necessarily consider the credibility of the defendant. In this circumstance, courtroom demeanor has been allowed as one factor to be taken into consideration."). In any case, as discussed, the trial court's admonishments and instructions significantly limited any prejudice cause by the prosecutor's remarks, and sufficient evidence supported Petitioner's conviction. *See Weeks*, 528 U.S. at 234; *Furman*, 190 F.3d at 1006; *Hall v. Whitley*, 935 F.2d at 165-66; *supra* Claim Three.

Finally, the prosecutor did not ask the jury for retribution, but instead merely explained Petitioner's motive for killing the victim and reiterated Petitioner's actions leading to the victim's death. (*See* 7 RT 834.) The prosecutor asked the jury to find Petitioner guilty of first degree murder based on the evidence and not solely because the victim died. (*See id.*) Even if the prosecutor's comments were improper, they did not "so infect[] the trial with unfairness." *Darden*, 477 U.S. at 181; *see Weeks*, 528 U.S. at 234; *Furman*, 190 F.3d at 1006; *Hall v. Whitley*, 935 F.2d at 165-66; *supra* Claim Three.

Accordingly, the Court finds that the California courts' rejection of Petitioner's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

///

34

**<u>Claim Fifteen</u>**

In his fifteenth claim, Petitioner states that the trial court deprived him of due process of law and his right to a jury trial by "failing to instruct on implied malice." (Am. Pet. 27.)  The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S. at 803-06.

"[T]here is no clearly established federal right, as determined by the Supreme Court, for a defendant to receive a lesser included offense instruction in a non-capital trial."  *Insyxiengmay v. Morgan*, 245 F. App'x 693, 695 (9th Cir. 2007) (*citing Solis v. Garcia*, 219 F.3d 922, 928-29 (9th Cir. 2000)); *see also Burt v. Yarborough*, No. 07-55979, 2008 WL 4648994, at *2 (9th Cir. Oct. 21, 2008) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." (*quoting Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998))).  Thus, Petitioner does not present a cognizable federal claim.  Regardless, the failure to instruct the jury on a theory of implied malice did not "so infect[] the entire trial that the resulting conviction violates due process" because sufficient evidence supported the conviction of first degree murder, including the elements of wilfulness, deliberation, and premeditation.  *See supra* Claim Three; (LD 8 at 39-43, 46-48); *Estelle*, 502 U.S. at 72; *see also Brecht*, 507 U.S. at 631; *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) (stating where a claim of instructional error involves failure to give an instruction, the petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law").

Accordingly, the Court finds that the California courts' rejection of Petitioner's implied malice claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

**<u>Claim Sixteen</u>**

In his sixteenth claim, Petitioner alleges that the trial court erroneously instructed the jury that intent to kill is a required element of voluntary manslaughter.  (Am. Pet. 27.)  The Court relies on and agrees with the last reasoned decision on this claim, that of the Fresno County Superior Court on habeas review, which stated that "[P]etitioner has provided no new and/or objective evidence supporting any

of his assertions." (LD 10); *Ylst*, 501 U.S. at 803-06.  Because the California Court of Appeal on direct review addressed the merits of this claim in a more detailed, yet still consistent, opinion than the superior court on habeas review, the Court also utilizes the court of appeal's opinion in its analysis.  (*See* LD 8 at 33-43.)  In denying Petitioner's erroneous instruction claim, the court of appeal stated:

## VOLUNTARY MANSLAUGHTER INSTRUCTIONS

The court instructed the jury as to voluntary manslaughter as a lesser included offense of murder (CALJIC Nos. 8.37, 8.40). The instructions defined two theories of voluntary manslaughter: (1) sudden quarrel or heat of passion (CALJIC No. 8.42), and (2) unreasonable self-defense (CALJIC No. 5.17). The court also instructed on justifiable homicide in self-defense as a complete defense (CALJIC No. 5.12).

[Petitioner] asserts that CALJIC No. 8.40 incorrectly stated the intent to kill was an element of voluntary manslaughter. [Petitioner] asserts the erroneous instruction violated his due process rights and requires reversal of his first degree murder conviction. Respondent concedes the intent to kill element should have been deleted from this instruction, but asserts any error is harmless.

Criminal homicide is divided into two classes: the greater offense of murder and the lesser included offense of manslaughter. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Manslaughter is the unlawful killing of a human being without malice, and is divided into three classes: voluntary, involuntary, and vehicular. (§ 192.)

Voluntary manslaughter is a lesser included offense of murder. (*People v. Lasko* (2000) 23 Cal.4th 101, 111 (*Lasko*).) "... A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' [citation], or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations].'" (*Id.* at p. 108; § 192, subd .(a).) It was previously held that the intent to kill was an essential element of voluntary manslaughter. (See *People v. Blakeley* (2000) 23 Cal.4th 82, 89 (*Blakeley*).) CALJIC No. 8.40, which defined voluntary manslaughter, stated that intent to kill was an element of the offense. (CALJIC No. 8.40 (2001 rev.) (6th ed.1996).)

In *Blakeley, supra*, 23 Cal.4th at pp. 90-91, and *Lasko, supra*, 23 Cal.4th at pp. 108-110, the California Supreme Court held that voluntary manslaughter does not require an intent to kill. Voluntary manslaughter is committed when one kills unlawfully and with conscious disregard for life, but lacks malice because of provocation or imperfect self-defense. (*Blakeley, supra*, 23 Cal.4th at pp. 90-91; *Lasko, supra*, 23 Cal.4th at pp. 108-110; see also *People v. Rios, supra*, 23 Cal.4th at p. 461, fn. 7; *People v. Johnson* (2002) 98 Cal.App.4th 566, 568-569.) . . .
. . . .

*Lasko* did not establish a new rule of law, but rather "gives 'effect to a statutory rule that the courts had theretofore misconstrued....' [Citation.]" (*People v. Crowe* (2001) 87 Cal.App.4th 86, 95.) *Lasko* is thus retroactive and applies to cases in which the alleged criminal conduct occurred before the case was decided on June 2, 2000. Therefore, regardless of the date of the charged offense, it is error to instruct the jury that voluntary manslaughter requires a finding that the killing was done with the intent to kill. (*Lasko, supra*, 23 Cal.4th at p. 111; *People v. Crowe, supra*, at pp. 93-95.) CALJIC No. 8.40 has been revised accordingly and now includes, as a required element of voluntary manslaughter, proof that "... [t]he perpetrator of the killing either intended to kill the alleged victim, or acted in conscious disregard for life." (CALJIC No. 8.40 (2001 rev.) (6th ed.1996).)

In the instant case, the court improperly instructed the jury with the pre-*Lasko* version of CALJIC No. 8.40, which included the intent to kill as an element of voluntary

36

manslaughter. [Petitioner] was charged with murdering Ny Noy on April 25, 2000, just two months before the Supreme Court's decision in *Lasko*, and his trial occurred in June 2002. The trial court acknowledged the holdings in *Lasko* and *Blakeley*, and realized that CALJIC No. 8.40 had been revised, but erroneously believed *Lasko* was not retroactive and the revised instruction only applied if the offense occurred after *Lasko* was decided. Neither [Petitioner] nor the prosecutor objected to the court's decision, and both parties had actually requested the pre-*Lasko* version of CALJIC No. 8.40.

The jury thus erroneously received the pre-*Lasko* version of CALJIC No. 8.40 as follows:

> "Every person who unlawfully kills another human being without malice aforethought but with *an intent to kill*, is guilty of voluntary manslaughter in violation of Penal Code section 192(a). [¶] There is no malice aforethought if the killing occurred [upon a sudden quarrel or heat of passion] [or] [in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.] [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing was done with *the intent to kill*." (Italics added.)

The trial court should have given the revised version of CALJIC No. 8.40 or deleted the references to an intent to kill as an element of voluntary manslaughter.[12]

Respondent concedes the court should have given the revised instruction but argues the error is harmless. [Petitioner] asserts the error is prejudicial because there was evidence which would have supported a voluntary manslaughter verdict, and the jury was prevented from returning that verdict because it was erroneously instructed that the intent to kill was an element of the offense. [Petitioner] also asserts the error is of federal constitutional dimensions and requires the application of the stricter standard of *Chapman v. California* (1967) 386 U.S. 18.

*Lasko* rejected the defendant's claim the instructional error violated his federal constitutional rights, and found instead the error was subject to review under the state constitutional standard as articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Lasko*, *supra*, 23 Cal.4th at pp. 111-113.) We thus reject [Petitioner's] claim that the *Chapman* standard applies, and must review the instructional error based on the *Watson* standard. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*Lasko* held reversal is required only if it appears reasonably probable the defendant would have obtained a more favorable outcome if correct instructions on voluntary manslaughter had been given which omitted the intent to kill as an element of the offense. (*Lasko*, *supra*, 23 Cal.4th at pp. 111-113; *People v. Crowe*, *supra*, 87 Cal.App.4th at p. 96.) *Lasko* deemed the instructional error harmless in that case for three reasons: (1) the jury was given CALJIC No. 8.50, which made it clear that even an intentional killing is manslaughter if committed in the heat of passion or in a sudden quarrel, and that the burden is on the prosecution to disprove those conditions; (2) neither side emphasized voluntary manslaughter during closing argument; and (3) the evidence strongly suggested an intent to kill. (*Lasko*, *supra*, at pp. 111-113; *People v. Crowe*, *supra*, at pp. 96-97.)

As in *Lasko*, it is not reasonably probably that a result more favorable to

---

12    [California Court of Appeal footnote 8:] "The precise holding in *Blakeley*, on the other hand—that one who, acting with conscious disregard for life, unintentionally kills in unreasonable self-defense is guilty of voluntary manslaughter rather than the less serious crime of involuntary manslaughter—constitutes an 'unforeseeable judicial enlargement of the crime of voluntary manslaughter and thus may not be applied retroactively.' [Citation.]" (*People v. Johnson*, *supra*, 98 Cal.App.4th at p. 569.) *Johnson* also suggested that *Lasko* may not be retroactively applied when there is substantial evidence of both reasonable provocation and imperfect self-defense. (*Id.* at p. 577, fn. 13.) We will not address this issue given respondent's tacit concession that the court should have given the revised version of CALJIC No. 8.40.

[Petitioner] would have occurred in this case if the jury had been given the revised version of CALJIC No. 8.40. First, the jury received CALJIC No. 8.50, which distinguished that murder requires malice while manslaughter does not. This instruction also stated:

> "[¶] ... [¶] When the act causing the death, though unlawful, is done [in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation,] [or] [in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury,] the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent. "To establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done [in the heat of passion or upon a sudden quarrel] [or] [in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury]."

Thus, as in *Lasko*, the jury herein was told that regardless whether the killing of the victim was intentional or unintentional, [Petitioner] could not be convicted of murder unless the prosecution proved that, at the time of the killing, [Petitioner] was not acting in the heat of passion or imperfect self-defense. (*Lasko*, *supra*, 23 Cal.4th at pp. 111-112.)

Second, our extensive review of closing argument reveals that voluntary manslaughter was not emphasized by either side. The prosecutor argued there was overwhelming evidence of first degree murder, malice, and an intent to kill. The prosecutor briefly discussed the two theories of voluntary manslaughter, explained the concept of lesser included offenses, and tried to anticipate defense counsel's possible arguments as to unreasonable self-defense or provocation. Defense counsel, however, never discussed voluntary manslaughter—or any other lesser included offense—as a possible verdict. Instead, counsel argued the prosecution failed to meet its burden of proof that [Petitioner] was the shooter, the reasonable inferences from the circumstantial evidence supported a finding of innocence, and the witnesses who placed [Petitioner] at the scene gave inconsistent statements and had motives to lie. Defense counsel suggested Somonn In, Sitha Yith, and It Chey were really the culprits in this case, Mr. Noy's three friends might have believed [Petitioner] was in the vicinity that night, and they fired at a car or a shadowy figure and accidentally hit Mr. Noy.

[Petitioner's] closing argument thus focused on the prosecution's alleged failure to meet the burden of proof, and asserted he was innocent based on the witnesses's inconsistent statements and motives to lie. [Petitioner] never asked the jury to return a verdict on voluntary manslaughter or any lesser offense. (*Lasko*, *supra*, 23 Cal.4th at p. 112.) Indeed, the prosecutor noted as much in his rebuttal argument:

> "Let me tell you what you did not hear in the defense closing. You did not hear one argument, not one, that this was a voluntary manslaughter because of heat of passion or imperfect self-defense. That was not even argued to you. And why? It's because the facts don't let you argue that."

Third, there is overwhelming evidence of [Petitioner's] intent to kill Mr. Noy. [Petitioner] was still in New Mexico when he learned of Lisa's alleged infidelity, and wrote her two letters and threatened to kill Mr. Noy. As soon as he returned to Fresno in April 2000, [Petitioner] hunted for Lisa and Mr. Noy. During the week preceding the killing, [Petitioner] accused family and friends of hiding Mr. Noy, Lisa, and the children, and repeatedly vowed to kill them when he found them. [Petitioner] called Mr. Noy's wife, informed her of the alleged affair, and threatened to kill him. [Petitioner] told

Kathy Sao that he would find the person who was having an affair with Lisa and kill him. [Petitioner] later asked Kathy Sao's husband for a gun.

On the afternoon of April 25th, [Petitioner] was repeatedly seen around Mr. Noy's apartment building, searching for him and making threats against him. He told Mr. Noy's wife that he wanted to kill him. He repeatedly went to Rann Phan's apartment, in the same building as Mr. Noy's residence, and angrily accused her of hiding Mr. Noy. [Petitioner's] last visit to Rann Phan's apartment occurred around 6:00 p.m., and she testified that he looked like he was going to kill someone.

Mr. Noy told his friends that fateful evening that [Petitioner] was going to meet him, and asked his friends to stay because he was afraid [Petitioner] was going to hurt him. When [Petitioner] failed to appear, Mr. Yith walked across the street to his own apartment and passed [Petitioner] sitting on the stairwell. The fatal shots were fired 15 minutes later. Mr. Noy was shot in the back as he walked away from South Dearing Street, where the seven .22-caliber casings were recovered. [Petitioner] had repeatedly called Mr. Noy the preceding week to harass him about the alleged affair, and reached him via Somonn In's cell phone. The day after the killing, Mr. In received a cell phone call from the same voice, and the caller said he did what he had to do.

[Petitioner] asserts the evidence of intent to kill was not compelling because there was evidence that [Petitioner] just wanted to talk with Mr. Noy that night. [Petitioner] also suggests the fatal bullet could have been "purposelessly fired or could have been a stray." These theories are pure speculation when compared to the direct evidence in this case: that [Petitioner] spent days searching for Mr. Noy, [Petitioner] repeatedly threatened to kill him, [Petitioner] arranged a meeting with him that night, [Petitioner] was seen across the street from Mr. Noy just 15 minutes before the shooting, and Mr. Noy repeatedly told his friends that he was afraid. There is no evidence that Mr. Noy or his associates threatened or confronted [Petitioner] in any way that night, and his friends didn't even know that Mr. Noy had obtained a gun. Indeed, the evidence supports the prosecutor's suggestion that Mr. Noy kept his revolver concealed in the back of his waistband: he was shot in the back, his body was only bloody in the back, he fell face-down on the ground, and the gun was lying behind him and covered with blood. In addition, the police searched Mr. Chey's Blazer that night and did not find any weapons.

[Petitioner] points to Patty Torres's statements on the tape recording as supporting either of the two voluntary manslaughter theories. Ms. Torres told Detective Stokes that [Petitioner] did not intend to shoot Mr. Noy but things got out of control, the other men were armed, and [Petitioner] was afraid. [Petitioner] notes the trial court found Ms. Torres's statements sufficient to give the voluntary manslaughter instructions, and asserts the instructional error is prejudicial because the jury could have relied on this evidence and returned a manslaughter verdict.

[Petitioner's] reliance on the court's decision to give the voluntary manslaughter instruction is meritless. While the court decided to instruct the jury on the two theories of voluntary manslaughter, this instructional decision does not establish a reasonable probability the jury would have returned a manslaughter verdict in this case if it had been told the offense did not require an intent to kill. The evidentiary threshold for giving an instruction is much less when compared to *Watson*'s standard of establishing reversible error. As the Supreme Court has explained, an instruction on a lesser included offense must be given whenever a reasonable jury could conclude the lesser, but not the greater, offense was committed. The court only determines the bare legal sufficiency of the evidence and not its weight. (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) In contrast, appellate review under *Watson*'s reasonable probability standard "... takes an entirely different view of the evidence. Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains

1   affected the result. Accordingly, a determination that a duty arose to give instructions on
    a lesser included offense, and that the omission of such instructions in whole or in part
2   was error, does not resolve the question whether the error was prejudicial...." (*Id.* at pp.
    177-178.)

3        The trial court herein properly relied on Detective Stokes's account of Patty
    Torres's statements to instruct on voluntary manslaughter, even though Ms. Torres later
4   disowned her story.[13] Nevertheless, the statements which she attributed to [Petitioner]
    were equivocal, contradictory, and hardly substantial evidence to support verdicts under
5   either theory of voluntary manslaughter. There was no other evidence that Mr. Noy and
    his associates planned to threaten or attack [Petitioner] in any way. Mr. Noy was well
6   aware of [Petitioner's] threats against him, but no one heard any reciprocal threats.
    Indeed, Mr. Noy apparently believed he could simply talk things over with [Petitioner]
7   and clear up the matter. While a .38-caliber revolver was found a few feet from Mr.
    Noy's body, it was fully loaded, there were no expended casings in the area, it had never
8   been fired, no one ever saw Mr. Noy brandish the gun, and it was probably tucked in the
    back of Mr. Noy's waistband when he was shot. The court's decision to instruct on
9   voluntary manslaughter does not support [Petitioner's] claim that *Watson* error occurred
    in this case.

10       Finally, the jury necessarily resolved the factual question of intent to kill against
    [Petitioner] when it returned the verdict for first degree murder with premeditation and
11  deliberation. By finding [Petitioner] acted with premeditation and deliberation, the jury
    necessarily concluded he did not act in the heat of passion, upon a sudden quarrel, or
12  based on unreasonable self-defense. (See, e.g., *People v. Prettyman* (1996) 14 Cal.4th
    248, 276.)

13       The first degree murder verdict in this case was not attributable to the
    instructional error, but instead to the fact that the evidence in support of the voluntary
14  manslaughter theories was extremely weak while the evidence of premeditation, express
    malice, and intent to kill was very strong. (See *Lasko, supra,* 23 Cal.4th at pp. 112-113;
15  *People v. Crowe, supra,* 87 Cal.App.4th at p. 97.) We thus conclude it is not reasonably
    probable that [Petitioner] would have been convicted of voluntary manslaughter if the
16  revised version of CALJIC No. 8.40 had been given.

17  (LD 8 at 33-43.)

18       To the extent Petitioner contends that the trial court's allegedly erroneous voluntary manslaughter

19  instruction was a violation of state law, such a claim is not cognizable on federal habeas review.  *See*

20  *Estelle*, 502 U.S. at 67-68.  "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction

21  rises to the level of a due process violation."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  Rather,

22  the question is whether "the ailing instruction by itself so infected the entire trial that the resulting

23  conviction violates due process."  *Estelle*, 502 U.S. at 72 (*quoting Cupp v. Naughten*, 414 U.S. 141, 147

24  (1973)); *Henderson*, 431 U.S. at 154.  An ambiguous or erroneous instruction is reviewed to determine

25  "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way"

26  _____

27       13      [California Court of Appeal footnote 9:] During the instructional phase, defense counsel agreed with the
    court's decision to instruct on both perfect and imperfect self-defense, but stated "for the record" that [Petitioner] did not want
28  such instructions given.

1  that violated the Constitution.  *Estelle*, 502 U.S. at 72.  "The burden of demonstrating that an erroneous

2  instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a

3  state court's judgment is even greater than the showing required to establish plain error on direct

4  appeal."  *Henderson*, 431 U.S. at 154.  The instruction must be considered in the context of the trial

5  record and the instructions as a whole.  *Estelle*, 502 U.S. at 72.

6          Here, even assuming that the trial court violated state law and erroneously stated, through

7  CALJIC 8.40 (*see* CT 164), that intent to kill is a required element of voluntary manslaughter, that

8  instruction by itself did not "so infect[] the entire trial that the resulting conviction violates due process."

9  *Estelle*, 502 U.S. at 72.  As the court of appeal explained, the jury received CALJIC 8.50, which

10  distinguishes that murder requires malice while manslaughter does not. (*See* CT 169.)  The jury was also

11  instructed, through CALJIC 8.50, that regardless of whether the killing was intentional or not, Petitioner

12  could not be convicted of murder unless the State proved that, at the time of the killing, Petitioner was

13  not acting in the heat of passion or imperfect self defense.  (*See* CT 169.)  In addition, neither the

14  prosecution nor defense counsel emphasized voluntary manslaughter during closing argument.

15  Furthermore, sufficient evidence supported Petitioner's conviction of first degree murder, including the

16  elements of malice, wilfulness, deliberation, and premeditation.  *See supra* Claim Three; (LD 8 at 39-43,

17  46-48.)

18          Accordingly, the Court finds that the California courts' rejection of Petitioner's erroneous

19  instruction claim was neither contrary to, nor an unreasonable application of, clearly established federal

20  law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

21  claim.

22                                              **Claim Seventeen**

23          In his seventeenth claim, Petitioner claims the trial court deprived him of "effective assistance

24  of counsel by directing [his] court appointed counsel to serve as investigator and witness on the financial

25  ability of [Petitioner] to retain trial counsel." (Am. Pet. 27.)  The Court relies on and agrees with the

26  last reasoned decision on this claim, that of the Fresno County Superior Court on habeas review, which

27  stated that "[P]etitioner has provided no new and/or objective evidence supporting any of his assertions."

28  (LD 10); *Ylst*, 501 U.S. at 803-06.  Because the California Court of Appeal on direct review addressed

41

the merits of this claim in a more detailed, yet still consistent, opinion than the superior court on habeas review, the Court also utilizes the court of appeal's opinion in its analysis.  (*See* LD 8 at 22-33.)  In denying Petitioner's ineffective assistance claim, the court of appeal stated:

### DENIAL OF MOTION TO HIRE RETAINED COUNSEL

[Petitioner's] first issue is based on a sequence of events which began when he made a series of unsuccessful *Marsden* motions. [Petitioner] then moved for a continuance to hire retained counsel, which the court also denied. [Petitioner] contends the court forced his appointed counsel into a conflict of interest when it asked counsel to contact [Petitioner]'s family and determine whether he had the financial resource to hire retained counsel. [Petitioner] asserts this conflict resulted in the denial of his right to effective assistance of counsel, and the denial was prejudicial because the court prevented him from hiring an attorney and forced him to go to trial with appointed counsel.

. . . .

**D.   [Petitioner]'s Second Request for Retained Counsel**

The court reconvened the proceedings and advised the prosecutor that the *Marsden* motion was denied, but asked him to research the question of granting a continuance to allow [Petitioner] to hire retained counsel. The prosecutor asked if [Petitioner] had $20,000 to hire an attorney to handle a first degree murder case, because "we're spinning our wheels" if he didn't have the money. The prosecutor also noted [Petitioner] had caused the two-year delay because he had been hiding in Mexico. The prosecutor was greatly concerned about whether he could again subpoena some of the witnesses because they had been difficult to find.

The court asked [Petitioner] if he had a substantial amount of money to hire an attorney to handle the entire case. [Petitioner] said his aunts and uncles had restaurants in Washington, and they would give him money. [Petitioner] had not spoken to them but he would have his family contact them. The court asked if he knew his family would give him the money. [Petitioner] replied that he assumed they would because they were family.

The court ordered a short recess for the parties to research [Petitioner]'s request for a continuance. The court advised [Petitioner]:

"... I think you have very good counsel and you may be making an erroneous decision here in terms of trying to jettison your attorney. That's mistake number one you may be doing. If you bring a tardy request—certainly, you have the absolute right to hire your own attorney in this case. The question is, when it is tardy you lose that right, okay? [¶] The second thing is you may be getting rid of a very good attorney, and, third of all, you're going to have to waive time because no attorney is going to be ready .[¶] ... [¶] Two or three weeks to probably retain an attorney, especially if you have to communicate with relatives out of state, they have to come up with money, ship it here. You have to consult with somebody, then that attorney comes on board say in two to three weeks. That would be the optimistic. Then they're going to say, judge, we may need a month, two month, three months to get ready."

[Petitioner] said he was willing to waive time.

The prosecutor objected and said there was no cause for continuance, no evidence [Petitioner] had any financial resources to hire an attorney, and suggested someone call [Petitioner]'s family to determine if they had the money. [Petitioner] said he would call his mother, and the court ordered him to have telephone privileges.

After a short recess, the prosecutor again objected to any continuance. While the

airline tickets were refundable, it would be difficult to locate the witnesses. In addition, [Petitioner] failed to show good cause for a continuance and that he could afford to hire an attorney. [Petitioner] said he spoke to his sister, and she was going to call his uncle. His sister thought "it would be likely" that his family would provide the money. The prosecutor asserted [Petitioner] had the burden of proving good cause and he should have to produce someone to confirm this claim. The court asked [Petitioner] to have his mother appear at the hearing.

The court's tentative ruling was to deny [Petitioner]'s request for a continuance because it was not timely, [Petitioner] had not expressed any previous interest in hiring an attorney, and his request was based on dissatisfaction with appointed counsel about tactical issues. The trial had been delayed for two years while [Petitioner] evaded arrest, it would be further delayed while [Petitioner] tried to hire an attorney, and it would be difficult to locate witnesses if it was again delayed.

> "For all those reasons, the tardiness of the–of the request, there's been no showing that [Petitioner] has any money of his own, he is depending on relatives to supply the money, and there's been no showing before this court that his family has any ability at all to procure the funds that would be necessary to retain private counsel.
>
> "I'll allow you to make that further attempt, if you wish. I'll allow you one more phone call before we break, if you wish to have your mother here so she can speak directly to the court, but, at this time, absent something that–I'm not sure even if your mother says to this court that she could have the money here in a very—very quick period of time, if that would change the court's opinion."

The court suggested defense counsel call [Petitioner]'s mother instead. Defense counsel agreed but he only had the sister's telephone number and [Petitioner] wouldn't disclose his mother's number. The court directed counsel to call [Petitioner]'s sister and advise her about the situation. The court again told [Petitioner] to have his mother appear that afternoon, and [Petitioner] said he would try.

The court reconvened that afternoon and defense counsel stated: "Well, I did as the court asked me and made the phone call. I'm in the position of presenting information to the court that might not be of benefit to my client, but the court did ask me to do that, so I did, not having the phone number of his mom." Defense counsel spoke to [Petitioner]'s sister, who stated she tried to raise $20,000 to hire an attorney but was unable to. The sister also provided the mother's telephone number. [Petitioner]'s mother only spoke Spanish, so counsel had his investigator call her.

The defense investigator appeared in court, and reported that he spoke with [Petitioner]'s mother and explained the situation. [Petitioner]'s mother said she didn't have any money to hire a private attorney. She confirmed there was an uncle in Washington with a restaurant, but his business wasn't going well and they wouldn't be able to afford a private attorney.

The court denied [Petitioner]'s motion for a continuance to hire a private attorney, and found his motion was untimely, interfered with the orderly administration of justice, [Petitioner] had failed to make any efforts to retain an attorney, and he lacked any financial resources. The court noted that [Petitioner] claimed his mother was going to obtain financial resources, but [Petitioner]'s mother stated they didn't have any money, "and that may be a reason why you did not want [defense counsel] to have the telephone number of your mother."

[Petitioner]'s mother suddenly arrived in the courtroom. The court asked if her family had the financial ability to retain private counsel. Mrs. Torres replied: "I can't. There's no reason for me to lie to you. We don't have the money." "All of my family is poor. We don't have any money." The court asked about the uncle in Washington. Mrs. Torres had talked to him but he didn't have any money either. The court again denied the

43

motion. [Petitioner] did not make any further requests for *Marsden* motions or to hire an attorney.

**E.      Analysis**

[Petitioner] relies on this lengthy sequence and contends the court violated his right to effective assistance of counsel by having his court-appointed attorney contact his family to determine his financial circumstances. [Petitioner] asserts this created a conflict of interest which resulted in the denial of his right to effective assistance of counsel because the court made his appointed counsel "serve two masters: the client and the court." [Petitioner] asserts the court's order interfered with appointed counsel's duty of loyalty because he disclosed information which was harmful to [Petitioner] and the conflict was prejudicial because he did not obtain "private representation or its equivalent."

"... In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688.) Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*In re Avena* (1996) 12 Cal.4th 694, 721.)" (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland v. Washington*, supra, 466 U.S. at p. 697; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008.)

A criminal defendant's right to effective assistance of counsel, guaranteed by both the state and federal Constitutions, includes the right to representation free from conflicts of interest. (*Wood v. Georgia* (1981) 450 U.S. 261, 271; *People v. Jones* (1991) 53 Cal.3d 1115, 1134; *People v. Bonin* (1989) 47 Cal.3d 808, 834.) "Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests." (*People v. Bonin, supra*, at p. 835.)

"... To establish a violation of the right to unconflicted counsel under the federal Constitution, 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 348, fn. omitted.) To establish a violation of the same right under our state Constitution, a defendant need only show that the record supports an 'informed speculation' that counsel's representation of the defendant was adversely affected by the claimed conflict of interest. (*People v. Cox* (1991) 53 Cal.3d 618, 654; *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 612-613.)" (*People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1009.)

Where a possible conflict of interest exists, the trial court must inquire into the circumstances of the potential conflict and take "whatever action may be appropriate." (*People v. Frye* (1998) 18 Cal.4th 894, 999.) A conviction will be reversed for the trial court's failure to satisfy its duty of inquiry only where the defendant demonstrates an actual conflict existed and that conflict adversely affected counsel's performance. (*Ibid.*; *People v. Bonin, supra*, 47 Cal.3d at pp. 837-838.) [Petitioner] must demonstrate that the conflict of interest prejudicially affected his counsel's representation. (*People v. Clark* (1993) 5 Cal.4th 950, 995.)

[Petitioner]'s claims of conflict and prejudice are specious given the entirety of the record. [Petitioner]'s request to hire retained counsel was clearly based on his frustration with the court's denial of his two *Marsden* motions. Indeed, [Petitioner] repeatedly declared he should not be forced to stand trial because of numerous inconsistencies in the police reports. [Petitioner] moved for a continuance and asked to hire his own attorney, and declared his mother and uncle would provide the requisite

funds to pay the attorney. The prosecutor properly demanded a more reliable evidentiary showing to support [Petitioner]'s request for a continuance. Defense counsel was clearly uneasy to contact [Petitioner]'s family, and [Petitioner] refused to even provide his mother's telephone number, but counsel ultimately complied with the court's request. Counsel and his investigator spoke to [Petitioner]'s sister and mother, and informed the court that [Petitioner]'s family did not have sufficient funds to hire an attorney. The court denied [Petitioner]'s motion.

[Petitioner] asserts there was a prejudicial conflict because counsel disclosed unfavorable information to the court, the court denied his motion, and he was thus prevented from hiring an attorney to represent him at trial. [Petitioner]'s assertions of prejudice are essentially rendered moot, however, by the belated appearance of [Petitioner]'s mother at the hearing. Indeed, [Petitioner] fails to even acknowledge that his mother appeared at the hearing and independently declared her family didn't have any money to hire an attorney. The court carefully questioned [Petitioner]'s mother, asked about the uncle, and was clearly willing to reconsider the motion based on her responses. Thus, the court's denial of [Petitioner]'s motion for a continuance, and his inability to hire an attorney, were based on his mother's statements in court and not counsel's investigation. In addition, there is no evidence the purported conflict affected counsel's representation of [Petitioner]. Counsel vigorously cross-examined the witnesses and brought forth their prior inconsistent statements, but was hampered in his efforts by [Petitioner]'s trial testimony, in which he insisted that he never stalked Mr. Noy and he left for Mexico just hours before the shooting.

. . . .

In contrast to *Kirkpatrick*, defense counsel herein did not actively oppose [Petitioner]'s request for a continuance to hire an attorney. While counsel may have been placed in a difficult situation, he did not violate any privileges or play a role in the court's decision to deny [Petitioner]'s motion. Indeed, the court realized [Petitioner] refused to provide them with his mother's telephone number because her statements differed from [Petitioner]'s representations about her alleged financial support. We thus conclude that to the extent the court's request created a potential conflict, the purported conflict was not prejudicial given the entirety of the record.

(LD 8 at 22-33.)

As discussed in Claim Nine, *supra*, for a petitioner to prevail on an ineffective assistance of counsel claim, he must show: (1) that counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687. In addition, the right to counsel includes the right to counsel of undivided loyalty, and a petitioner bears the burden of proof when claiming a conflict of interest with counsel. *See Cuyler v. Sullivan*, 446 U.S. 335, 349-50, 356 (1980). To show a conflict of interest, a petitioner must show "(1) that counsel actively represented conflicting interests, and (2) that an actual conflict of interest adversely affected his lawyer's performance." *Bonin v. Calderon*, 59 F.3d 815, 825 (9th Cir. 1995) (citation omitted). "[T]he *possibility* of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an *actual* conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350 (emphasis added). "[A]n adverse effect in the *Cuyler*

45

1   sense must be one that significantly worsens counsel's representation of the client before the court"

2   rather than one that "ultimately has no significant impact on counsel's representation." *United States*

3   *v. Mett*, 65 F.3d 1531, 1535-36 (9th Cir. 1995).

4          Here, the Court agrees with the court of appeal's extensive analysis of Petitioner's ineffective

5   assistance and conflict of interest claims.  Petitioner fails to show that his counsel's performance was

6   deficient or that he suffered any prejudice, especially in light of Petitioner's mother corroborating

7   counsel's statement that Petitioner could not afford another attorney.  (*See* 2 RT 113-15.)  In addition,

8   Petitioner does not show that his counsel actively represented conflicting interests, or, assuming an

9   actual conflict, his counsel's performance was affected.  *Bonin*, 59 F.3d at 825.  As stated by the court

10  of appeal, counsel vigorously cross-examined the witnesses and brought forth their prior inconsistent

11  statements, but was hampered in his efforts by Petitioner's testimony that he never stalked the victim

12  and that he departed for Mexico just hours before the shooting.

13         Accordingly, the Court finds that the California courts' rejection of Petitioner's ineffective

14  assistance claim was neither contrary to, nor an unreasonable application of, clearly established federal

15  law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

16  claim.

17                                        **Claim Eighteen**

18         In his eighteenth and final claim, Petitioner contends the mandatory punishment of twenty-five

19  years to life for the firearm enhancement constitutes cruel or unusual punishment under the California

20  Constitution.  (Am. Pet. 27.)  The Court relies on and agrees with the last reasoned decision on this

21  claim, that of the Fresno County Superior Court on habeas review, which stated that "[P]etitioner has

22  provided no new and/or objective evidence supporting any of his assertions."  (LD 10); *Ylst*, 501 U.S.

23  at 803-06.

24         A petitioner may not obtain federal habeas relief by alleging the violation of a state constitution.

25  *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68; *Hinman v. McCarthy*, 676 F.2d 343, 349 (9th Cir.

26  1982).  Thus, Petitioner's allegation of the violation of the California Constitution is not cognizable on

27  federal habeas corpus.

28         Accordingly, the Court finds that the California courts' rejection of Petitioner's cruel or unusual

1  punishment claim was neither contrary to, nor an unreasonable application of, clearly established federal

2  law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

3  claim.

4  ## Certificate of Appealability

5  Under the AEDPA, an applicant seeking to appeal a district court's dismissal of a habeas petition

6  under 28 U.S.C. § 2254 must first obtain a certificate of appealability ("COA") from a district judge or

7  circuit judge.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A judge should either grant the COA

8  or state reasons why it should not issue.  Fed. R. App. P. 22(b)(1).  A COA request should be decided

9  by a district court in the first instance.  *Id.*; *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

10  The applicant for a COA must make a "substantial showing of the denial of a constitutional

11  right."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *United States v.*

12  *Christakis*, 238 F.3d 1164, 1168 n.4 (9th Cir. 2001).  A "substantial showing" is defined as a

13  demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the

14  issues differently; or (3) that issues are adequate to deserve encouragement to proceed further.  *Barefoot*

15  *v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for

16  substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard

17  announced in *Barefoot v. Estelle*).  When, as present here, a district court has rejected constitutional

18  claims on their merits, the COA standard is straightforward.  "The petitioner must demonstrate that

19  reasonable jurists would find the district court's assessment of the constitutional claims debatable or

20  wrong."  *Slack*, 529 U.S. at 484.

21  This Court has reviewed the record of this case and finds that reasonable jurists would not find

22  the Court's assessment of the constitutional claims debatable or wrong.  On the merits of this case,

23  reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence.

24  Accordingly, a certificate of appealability is denied.

25  ///

26  ///

27  ///

28  ///

## CONCLUSION AND ORDER

For the reasons discussed above, the Court DENIES the Amended Petition for Writ of Habeas Corpus with prejudice and DENIES the issuance of a certificate of appealability.  The Clerk of Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 05-01479 LJO TAG HC.


IT IS SO ORDERED.

**Dated:    December 8, 2008    **            **    /s/ Lawrence J. O'Neill    **
                                             UNITED STATES DISTRICT JUDGE